**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 29, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MOSHE TAL; BRICKTOWN 2000,
INC.; TAL TECHNOLOGIES, INC.,

      Plaintiffs - Appellants,

v.

DAN RANDOLPH HOGAN;
TMK/HOGAN JOINT VENTURE,
also known as Commercial Real Estate
Services; HOGAN PROPERTY
MANAGEMENT, LLC;
BRICKTOWN-TMK/HOGAN
PARKING, LLC., also known as
Bricktown-SMC/Hogan, LLC;
BRICKTOWN-TMK/HOGAN
ENTERTAINMENT, LLC, also known
as Bricktown Entertainement, LLC;
MARK D. ELGIN; STONEGATE
MANAGEMENT COMPANY, LLC;
ELGIN DEVELOPMENT COMPANY,
LLC; TDC COMPANY, LLC; TIANA
P. DOUGLAS,

      Defendants - Appellees.
_____

THE CITY OF OKLAHOMA CITY;
OKLAHOMA CITY URBAN
RENEWAL AUTHORITY,

      Amici-Curie.

No. 03-6293

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 02-CV-324-F)**

Submitted on the Briefs:[*]

Moshe Tal, *pro se*, Plaintiff-Appellant.

James E. Dunn, James E. Dunn & Associates, P.C., of Oklahoma City, Oklahoma, for Plaintiffs-Appellants Bricktown 2000, Inc. and Tal Technologies, Inc.

Melvin R. McVay, Jr., Robert N. Sheets, Lloyd T. Hardin, Jr., Heather L. Hintz, Phillips, McFall, McCaffrey, McVay & Murrah, P.C., Oklahoma City, Oklahoma, for Defendants-Appellees Hogan, TMK/Hogan Joint Venture; Hogan Property Management, LLC; Bricktown-TMK/Hogan Parking, LLC; Bricktown-TMK/Hogan Entertainment, LLC; Mark D. Elgin; Stonegate Management Company, LLC; Elgin Development Company, LLC, and TDC Company, LLC.

Gerard F. Pignato, Tom Cooper and Brad L. Roberson, Pignato & Cooper, P.C., Oklahoma City, Oklahoma, for Defendant-Appellee Tiana P. Douglas.

William R. Burkett, Daniel T. Brummitt, Office of Municipal Counselor, Oklahoma City, Oklahoma, for Amicus Curiae The City of Oklahoma City.

Leslie V. Batchelor, Dan Batchelor, Center for Economic Development Law, Oklahoma City, Oklahoma, for Amicus Curiae Oklahoma City Urban Renewal Authority.

Before **BRISCOE, MURPHY** and **O'BRIEN**, Circuit Judges.

---

[*]After examining the briefs and the appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1. The case is therefore ordered submitted without oral argument.

**O'Brien**, Circuit Judge.

This case is the latest in a long running dispute between Moshe Tal, the founder and president of both Tal Technologies, Inc., (Tal, Inc.) and Bricktown 2000, Inc. (Bricktown, Inc.), and Oklahoma City, the Oklahoma City Urban Renewal Authority (Renewal Authority) and various private Developers[1] over the condemnation of Tal, Inc.'s land and Bricktown, Inc.'s failure to acquire redevelopment rights for the area in downtown Oklahoma City known as Bricktown. On March 14, 2002, Tal, Tal, Inc. and Bricktown, Inc. filed suit in the United States District Court for the Western District of Oklahoma against the Developers and the executive director of the Renewal Authority, Tiana Douglas, alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, and the Sherman Act, 15 U.S.C. § 2. They also asserted pendant state law claims for tortious interference with business and fraudulent condemnation of Tal, Inc.'s land. On September 30, 2003, the district court dismissed the claims and the plaintiffs appealed. We exercise jurisdiction

---

[1] The Developers include: Dan Randolph Hogan; TMK/Hogan Joint Venture, a.k.a. Commercial Real Estate Services Joint Venture; Hogan Property Management, LLC.; Bricktown-TMK/Hogan Parking, LLC, a.k.a. Bricktown-SMC/Hogan, LLC; Bricktown-TMK/Hogan Entertainment, LLC, a.k.a. Bricktown Entertainment, LLC; Mark D. Elgin; Stonegate Management Company, LLC; Elgin Development Company, LLC; and TDC Company, LLC.

under 28 U.S.C. § 1291 and **AFFIRM**.

BACKGROUND

Under the Oklahoma Urban Redevelopment Law, 11 OKLA. STAT. TIT. §§ 38-101 to 123, cities in Oklahoma may create urban renewal authorities, which can prepare urban renewal plans for specific urban renewal areas. 11 OKLA. STAT. TIT. §§ 38-101(11), 38-106(A). The powers of an urban renewal authority are exercised by commissioners. 11 OKLA. STAT. TIT. § 38-107(E). However, under 11 OKLA. STAT. TIT. § 38-107(F), urban renewal authorities "may employ an executive director . . . and such other agents and employees, permanent and temporary, as it may require. . . ." The urban renewal plans must meet the requirements of the statute and be approved by the municipal governing body. 11 OKLA. STAT. TIT. § 38-106. One statutory requirement is that the plan allow private developers the opportunity to obtain redevelopment contracts. 11 OKLA. STAT. TIT. § 38-104.

Pursuant to the Oklahoma Urban Redevelopment Law, Oklahoma City created the Renewal Authority, "a public body corporate." 11 OKLA. STAT. TIT. § 38-107(A). In 1976, the Renewal Authority proposed an Urban Renewal Plan covering an area in Oklahoma City known as Bricktown. In 1993, the residents of Oklahoma City approved a sales tax to be used to redevelop sections of the city under the guidance of the Oklahoma City Metropolitan Area projects program (MAPS). The Bricktown redevelopment plan was amended in 1997 as the MAPS

Sports-Entertainment-Parking Support Redevelopment Plan. Tiana Douglas served as the executive director of the Renewal Authority during the period at issue.

On March 25, 1997, the City brought a condemnation action against Tal, Inc. seeking to condemn two parcels of Tal, Inc.'s land, totaling 1.4 acres, that fronted a canal running into Bricktown. The City's intended use was public parking, public recreation and parks. Tal, Inc. objected to the condemnation, challenging the public necessity of the taking. The trial court overruled Tal, Inc.'s objection and entered a condemnation order on August 28, 1997, which was modified on October 2, 1997. The City then transferred the land to the Renewal Authority "with the proviso that [the] City would receive the net proceeds from the sale of the property by [the Renewal Authority] and that the price paid to the Urban Renewal Authority for the property would be not less than the actual fair market value of [the] property." *City of Okla. City v. Okla. City Urban Renewal Auth.*, 988 P.2d 901, 905 (Okla. 1999) (*Tal I*) (internal quotations omitted).

Also in 1997, in an effort to encourage development of a new sports and entertainment district by private developers, the city council approved the Bricktown redevelopment plan. *Tal I*, 988 P.2d at 905. The Renewal Authority requested proposals from developers interested in obtaining the redevelopment contract for Bricktown. Tal, Inc. and Bricktown, Inc. applied for the contract but "the City Council, after widely publicized hearings and based on an extremely

close vote, ultimately awarded the [redevelopment contract] to . . . TMK/Hogan rather than to Tal's group. The final decision was made by the City Council only after two years of public meetings, public notices, public hearings, and citizen review."[2] *Id*. The Renewal Authority then "received fair market value for the [condemned] property" from the Developers in the amount of $3.3 million. *Id*.

Subsequently, Tal along with the organization Taxpayers Against Ripoffs (TAR), filed a state *qui tam* action against the Renewal Authority alleging Tal, Inc.'s land had been impermissibly taken for private use and the redevelopment contract was awarded amid "bid-rigging." They also demanded that the City file a lawsuit to recover the property and declare the contract void. *Tal I*, 988 P.2d at 903-04. On January 26, 1999, the City filed a declaratory action against the Renewal Authority to settle whether the condemnation and the transfer to the Renewal Authority had been valid. *Id*. at 904. Tal and TAR sought to intervene twice but were denied. *See Tal I*, 988 P.2d at 904-05; *Okla. ex rel. Tal v. City of Okla. City*, 19 P.3d 268 (Okla. 2000), *cert. denied*, 534 U.S. 814 (2001) (*Tal III*).[3]

---

[2] Specifically, the Renewal Authority and TMK/Hogan entered into the redevelopment contract on July 21, 1998. The city council also awarded a parking redevelopment contract to Bricktown Parking Investors, LLC, on December 19, 1997. Bricktown Parking Investors, LLC is not a party to the present dispute.

[3] *Tal II* was an attempt by Tal and TAR to challenge the operation of a baseball stadium located in Bricktown. The district court dismissed and the Oklahoma Supreme Court affirmed. *See Okla. ex rel. Tal v. Norick*, 991 P.2d 999, 1001 (Okla. 1999) (*Tal II*). *Tal IV* was an appeal of the award of attorney's

On September 28 and November 2, 1999, almost two years after the entry of the condemnation order, Tal, Inc. filed two motions to reconsider the condemnation order based on newly discovered evidence. In both motions, Tal, Inc. claimed the City had fraudulently deceived the court and delivered the land to the Renewal Authority for sale to private developers, which it argued was a non-public use. Tal, Inc. also argued the Renewal Authority had exceeded the scope of its eminent domain power by condemning the land for use as parking, a usage for which Tal, Inc. had already intended the land, and then by changing the development of the land from parking to non-parking. The trial court denied both motions. Tal, Inc. appealed to the Oklahoma Court of Civil Appeals which construed the appeal as alleging that the City had obtained the condemnation order by fraud. *City of Oklahoma City v. Tal Techs., Inc.*, Case No. 94,045, at 5 n.3 (Okla. Civ. App. July 31, 2001). The Court of Civil Appeals affirmed, holding Tal, Inc. had waived its fraud claim by failing to exercise due diligence in discovering the fraud. It also concluded that the City had properly condemned

---

fees against Tal and TAR in *Tal III*. Although the Oklahoma Supreme Court reversed the award of attorney's fees, it did reiterate *Tal III*'s holding that Tal, Inc. was precluded from asserting fraud was appropriate. *See Okla. ex rel. Tal. v. City of Okla. City*, 61 P.3d 234, 247 (Okla. 2002) (*Tal IV*). The Oklahoma Supreme Court recently dismissed as premature an appeal from summary judgment in favor of the City and the Renewal Authority involving the validity of the underlying transactions. *See Okla. City Urban Renewal Auth. v. City of Okla. City*, 110 P.3d 550 (Okla. 2005) (*Tal V*). These enumerated *Tal* cases are separate from the initial condemnation action and the corresponding direct appeals.

Tal, Inc.'s land for a valid public purpose. *Id.* at 7. Tal, Inc.'s subsequent petitions for certiorari to the Oklahoma Supreme Court and the United States Supreme Court were denied. *See Tal Techs., Inc. v. City of Okla. City*, 535 U.S. 987 (2002).

On March 14, 2002, Tal, Bricktown, Inc. and Tal, Inc. filed a complaint against the Developers and Douglas in the United States District Court for the Western District of Oklahoma. They alleged the Developers and Douglas conspired to fraudulently condemn Tal, Inc.'s land; plotted to monopolize under the Sherman Act, 15 U.S.C. § 2; participated in "bid-rigging" in violation of RICO, 18 U.S.C. § 1962, and engaged in tortious interference with business under Oklahoma law. On April 1, 2002, Plaintiffs filed their First Amended Complaint. Both the Complaint and the First Amended Complaint were signed by Tal, appearing *pro se* for all three plaintiffs. On March 18, 2002, the district court, acting *sua sponte,* ordered Bricktown, Inc. and Tal, Inc. to retain counsel within thirty days. Tal filed a motion to reconsider, which was denied on July 2, 2002. Thereafter, Tal, Inc. and Bricktown, Inc. secured counsel.

On May 31, 2002, the Developers and Douglas filed motions to dismiss the First Amended Complaint.[4] The district court heard the motions on October 30, 2002, and entered a written order granting Defendants' motions on October 31.

---

[4] On June 4, 2002, the Renewal Authority and the City filed an amicus curiae brief in support of the motions to dismiss.

However, Bricktown, Inc. was granted leave to refile its RICO and Sherman Act claims and Tal, Inc. was granted leave to refile its RICO claims. All of Tal's individual claims were dismissed.

On December 16, 2002, Tal, Inc. and Bricktown, Inc. filed a Second Amended Complaint and a RICO Case Statement. Tal, Inc. realleged its conspiracy to condemn by fraud claim against Douglas.[5] Tal, Inc. and Bricktown, Inc. alleged RICO violations against the Developers under § 1962(b), against Douglas under § 1962(c), and against the Developers and Douglas under § 1962(d). Bricktown, Inc. asserted conspiracy to monopolize under the Sherman Act, 15 U.S.C. § 2, against the Developers and Douglas. The Second Amended Complaint also included state law claims for tortious interference with business against the Developers and conspiracy to condemn by fraud against Douglas. On January 31, 2003, the Developers and Douglas filed motions to dismiss the Second Amended Complaint under FED. R. CIV. P. 12(b)(6).

On September 30, 2003, the district court granted the Developers and Douglas' motions to dismiss the Second Amended Complaint. This appeal followed.

## DISCUSSION

---

[5] The district court did not rule on the conspiracy to condemn by fraud claim in its October 31, 2001 order because the claim had been voluntarily withdrawn.

A motion to dismiss under FED. R. CIV. P. 12(b)(6) "admits all well-pleaded facts in the complaint as distinguished from conclusory allegations." *Mitchell v. King*, 537 F.2d 385, 386 (10th Cir. 1976). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (quotation omitted). The legal sufficiency of a complaint under Rule 12(b)(6) is a question of law which this Court reviews *de novo. Id.*; *see S. Disposal, Inc. v. Tex. Waste Mgmt.*, 161 F.3d 1259, 1261-62 (10th Cir.1998). "In doing so, all facts alleged in the complaint are taken as true and all reasonable inferences are indulged in favor of the plaintiffs." *GF Gaming Corp. v. City of Black Hawk, Colo.*, 405 F.3d 876, 881 (10th Cir. 2005). "This court can affirm the district court's dismissal on any ground sufficiently supported by the record." *Id*. at 882.

I.    **Tal's Individual Claims**

The district court dismissed Tal's individual antitrust and RICO claims in the First Amended Complaint for lack of standing. Tal challenges this ruling as well as the district court's order denying him the ability to represent Tal, Inc. and Bricktown, Inc. *pro se*.

A.    *Standing to file antitrust and RICO claims*

In order to have standing under Article III of the Constitution, a plaintiff

-10-

must allege an "injury-in-fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). However, the standing requirements in the antitrust context are more rigorous than that of the Constitution. Thus, "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). This additional determination stems from section 4 of the Clayton Act, 15 U.S.C. § 15, which states "[a]ny person . . . injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages . . . sustained, and . . . a reasonable attorney's fee."[6] Thus, antitrust standing requires a private plaintiff to show "(1) an 'antitrust injury'; and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws." *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1254 (10th Cir. 2003); *see Sports Racing Services, Inc. v. Sports Car Club of America, Inc.*, 131 F.3d 874, 882 (10th Cir. 1997); *City of Chanute, Kan. v.*

---

[6] "The private antitrust action continues to be the principal mechanism by which the antitrust laws are enforced. As many as 90% of antitrust cases are brought by private plaintiffs." HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY: THE LAW OF COMPETITION AND ITS PRACTICE 593 (2d ed. 1999).

*Williams Natural Gas Co.*, 955 F.2d 641, 652 (10th Cir. 1992).[7]  An antitrust

injury is defined as an "injury of the type the antitrust laws were intended to

prevent and that flows from that which makes defendants' acts unlawful."

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).

Section 4 of the Clayton Act has been held to exclude personal injuries,

*Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979), as well as derivative injuries

such as loss of stock value or employment opportunities.  *Sharp v. United*

*Airlines, Inc.*, 967 F.2d 404, 407-08 (10th Cir. 1992); *Curtis v. Campbell-Taggart,*

*Inc.*, 687 F.2d 336, 338 (10th Cir. 1982).  "It is settled law that shareholders and

employees do not have standing to sue for antitrust violations that injure a

corporation."  *Jones v. Ford Motor Co.*, 599 F.2d 394, 397 (10th Cir. 1979).  This

prohibition also includes corporate officers.  *Nat'l Indep. Theatre Exhibitors, Inc.*

*v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984) ("Neither an

officer nor an employee of a corporation has standing to bring an action in his

own right for an antitrust violation causing injury to the corporation and its

_____

[7] In *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, we pointed out that there may be some interdependence between "antitrust injury" and "antitrust standing."  899 F.2d 951, 960-61 (10th Cir. 1990).  In *City of Chanute*, we clarified "[a]n antitrust injury is different from antitrust standing.  *Standing cannot be established without an antitrust injury*, but the existence of an antitrust injury does not automatically confer standing."  955 F.2d at 652 n.14 (internal citation omitted and emphasis added).  *See also Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1182 (5th Cir. 1988) ("Antitrust injury is a component of the standing inquiry, not a separate qualification.").

business.”).

Similarly, RICO allows “[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue therefor in any appropriate United States district court and . . . recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. . . .” 18 U.S.C. § 1964(c). “Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act. . . .” *Holmes v. Secs. Investor Protection Corp.*, 503 U.S. 258, 267 (1992). Thus, like the Sherman Act, standing for private individuals under RICO requires a plaintiff to have “been injured in his business or property by the conduct constituting the violation.” *Sedima, S.P.R.L. v. Imrex, Co.*, 473 U.S. 479, 496 (1985). Similarly, corporate presidents ordinarily do not have standing to assert an individual RICO claim for conduct which harmed the corporation, because such injuries are derivative. *Manson v. Stacescu*, 11 F.3d 1127, 1132-33 (2d Cir. 1993).

As the district court held, Tal does not have standing to assert his individual RICO and antitrust claims because he has not shown that he suffered an antitrust injury as a result of the Appellees’ actions. At best, Tal, Inc., as owner of the condemned property, suffered from the alleged fraudulent condemnation, and Bricktown, Inc., which submitted the redevelopment bid, suffered from the alleged Sherman Act and RICO violations as they relate to the award of development contracts. However, all of Tal’s claims derive from his

-13-

role as the president of Tal, Inc. and Bricktown, Inc.  These injuries are the companies' and the companies have the right to vindicate them.  Tal cannot assert personal injury based on the condemnation of property he did not own, nor may he claim lost profits and business opportunities from the Appellees' alleged "bid-rigging."  Additionally, injury to his reputation, dignity and emotional damages are not the type of injuries redressable by the antitrust laws or RICO which are expressly limited to injuries to "business or property."  15 U.S.C. § 15; 18 U.S.C. § 1964(c); *see Reiter*, 442 U.S. at 339; *Manson*, 11 F.3d at 1132.

B.      *Right to represent the corporations pro se*

It has been our long-standing rule that a corporation must be represented by an attorney to appear in federal court.[8]  Consistent with that rule, Local Rule 17.1

---

[8] *See Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 556 (10th Cir. 2001) ("As a general matter, a corporation or other business entity can only appear in court through an attorney and not through a non-attorney corporate officer appearing *pro se*."); *DeVilliers v. Atlas Corp.*, 360 F.2d 292, 294 (10th Cir. 1966) ("[A] corporation can appear in a court of record only by an attorney at law."); *Flora Constr. Co. v. Fireman's Fund Ins. Co.*, 307 F.2d 413, 414 (10th Cir. 1962) ("The rule is well established that a corporation can appear in a court of record only by an attorney at law.").  *See also Rowland v. California Men's Colony*, 506 U.S. 194, 201-02 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."); *Commercial & R.R. Bank of Vicksburg v. Slocomb, Richards & Co.*, 39 U.S. (14 Pet.) 60, 65 (1840) ("[A] corporation cannot appear but by attorney. . . .") *overruled in part by* 43 U.S. (2 How.) 497 (1844); *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 830 (1824) ("A corporation, it is true, can appear only by attorney, while a natural person may appear for himself.").  *See generally Strong Delivery Ministry Ass'n v. Bd. of Appeals of Cook County*, 543 F.2d 32, 33-34 (7th Cir. 1976) (explaining the justification for the rule).

-14-

of the United States District Court for the Western District of Oklahoma provides: "[p]arties who are not natural persons may not appear *pro se*." Thus, the district court did not err in denying Tal the right to represent Tal, Inc. and Bricktown, Inc. *pro se* and requiring the corporations to secure counsel.

Tal tries to avoid this result by arguing: (1) Oklahoma statutes give directors the right to sue on behalf of the corporation; (2) allowing a shareholder to be held liable for a company's shortcomings but not allowing a shareholder to appear *pro se* for the company creates a double standard; (3) small companies may not be able to afford to hire an attorney; and (4) a company has a constitutional right to allow its directors to represent it *pro se*.

Tal's arguments are without merit. First, no Oklahoma statute confers on directors the right to appear *pro se*, only the right to institute suits on behalf of a corporation. *See* 18 OKLA. STAT. TIT. § 1016(2). Moreover, such a right must be exercised in conformity with court rules that require corporations to be represented by counsel. *See Massongill v. McDevitt*, 828 P.2d 438, 439-40 (Okla. Ct. App. 1989). Tal's double standard argument ignores the benefits of corporate status. Shareholders, including Tal, enjoy limited liability, unless the corporate veil is pierced because the company is an instrumentality or alter ego of its shareholders. *See Key v. Liquid Energy Corp.*, 906 F.2d 500, 503-04 (10th Cir. 1990) (discussing piercing of corporate veil). Moreover, Tal's argument ignores his power as a director to institute a suit, through counsel, on behalf of Tal, Inc.

and Bricktown, Inc.  There is little reason to believe that a company director will be hindered in advancing the interests of the company by requiring the company to be represented by an attorney.

Finally, Tal seeks to stretch the Constitution beyond elastic limits by arguing, "[i]f . . . a criminal defendant has the right to proceed *Pro Se*, the right should [] apply with even greater force in a civil context.  While criminal defendants are entitled to representation by counsel at no charge, . . . no comparable right exists for civil litigants." (Tal's Br. at 30.)  Tal's comparison with a criminal defendant's right to an attorney or to appear *pro se* fails for the obvious reason that the Constitution only guarantees a right of representation to criminal defendants.  Tal may proceed *pro se*, but Tal, Inc. and Bricktown, Inc. may not.  Corporations bear the costs associated with filing suit until their claims are vindicated.

## II.    Tal, Inc.'s Condemnation Claim and the *Rooker-Feldman* Doctrine

Tal, Inc. alleges Appellees violated RICO by engaging in a conspiracy to condemn its property through fraud.  The district court held this claim was barred under the *Rooker-Feldman* doctrine as a prior state court case had addressed the propriety of the condemnation.[9]  Tal, Inc. tries to avoid this result by arguing: (1)

---

[9] The *Rooker-Feldman* doctrine traces back to Justice Willis Van Devanter's seminal opinion in *Rooker v. Fidelity Trust Coompany*, 263 U.S. 413 (1923) and its elaboration in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462 (1983).

-16-

the City committed fraud on appeal to the Oklahoma Court of Civil Appeals and this fraud creates new grounds for yet another appeal; (2) the Defendants in this case were not the defendants in the prior case; (3) the state condemnation case is still pending; (4) the Oklahoma courts ignored the difference in condemnation powers possessed by municipalities and urban renewal authorities; and (5) the condemned property was sold to the developers far below market value.

Pursuant to 28 U.S.C. § 1257(a), "federal review of state court judgments can be obtained only in the United States Supreme Court." *Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1169 (10th Cir. 1998). The *Rooker-Feldman* doctrine precludes "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 125 S. Ct. 1517, 1521-22 (2005). Thus, the *Rooker-Feldman* doctrine prevents "a party losing in state court . . . from seeking what in substance would be appellate review of [a] state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994).

The *Rooker-Feldman* doctrine "prohibits a lower federal court [both] from considering claims actually decided by a state court, and claims inextricably intertwined with a prior state-court judgment." *Kenmen Eng'g v. City of Union*,

-17-

314 F.3d 468, 473 (10th Cir. 2002) (internal citation and quotations omitted).[10]  A

claim is inextricably intertwined if "the state-court judgment *caused,* actually and

proximately, the *injury* for which the federal-court plaintiff seeks *redress.*"  *Id.* at

476.  A federal case does not involve an "inextricably intertwined" state court

judgment if the complaint challenges the constitutionality of the state law, so long

as the state court did not address it and the plaintiff does not request the federal

court to upset the state court judgment.  *Id.*

Here, the district court correctly concluded the *Rooker-Feldman* doctrine

precluded Tal, Inc.'s condemnation claim in federal court.  Oklahoma courts

squarely considered and rejected Tal, Inc.'s claims that the initial condemnation

order had been obtained through fraud on the part of the City, *City of Okla. City

v. Tal Techs., Inc.*, and that the property was undervalued.  *Tal I*, 988 P.2d at 905

("The property was appraised on three separate occasions by professional

appraisers before it was sold.  The trial court found and the record supports that

the Urban Renewal Authority received fair market value for the property.").

All of Tal, Inc.'s attempts to avoid this result are unavailing.  It is true that

---

[10] The Supreme Court has recently begun narrowing the scope of the *Rooker-Feldman* doctrine.  *See Exxon Mobil Corp.*, 544 U.S. at 292 (holding *Rooker-Feldman* inapplicable to parallel state and federal litigation); *and Lance v. Dennis*, 126 S.Ct. 1198, 1202 (2006) ("The *Rooker-Feldman* doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment.") *overruling in part*, *Kenmen Eng'g*, 314 F.3d at 481.  However, none of these limitations are applicable to this case.

new allegations of fraud might create grounds for appeal, but that appeal should be brought in the state courts. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415 (1923).[11] Additionally, Tal, Inc. does not specifically raise new allegations of fraud but only contends the City itself continues to make false claims: "[i]n its 9/20/00 response to [Tal, Inc.'s] Appeal, the City filed an Answer Brief which contained numerous other false and/or inaccurate factual representations, including, *continuation of its false initial assertion* that [Tal, Inc.'s] property was condemned for 'public use.'" (Corporate Br. at 7 (emphasis added).) Thus, the Oklahoma Civil Court of Appeals was confronted with and reviewed the same "fraud" as the trial court. Its holding is equally applicable to the "fraud" alleged at the trial court level (or "before the trial court") as it was to the "fraud" allegedly perpetrated before its very eyes. Moreover, and not withstanding Tal, Inc.'s disagreement, the Oklahoma courts' determination that "public use"

---

[11] In *Rooker*, the Court specifically stated that errors in state cases should be reviewed and settled through the state appellate process.

> If the constitutional questions stated in the bill actually arose in the cause, it was the province and duty of the state courts to decide them; and their decision, whether right or wrong, was an exercise of jurisdiction. If the decision was wrong, that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding. Unless and until so reversed or modified, it would be an effective and conclusive adjudication.

*Id.*

includes economic development does not constitute fraud. *See Kelo v. City of New London*, 125 S. Ct. 2655, 2665-66 (2005) (holding "public purpose" allows economic development by private parties if the development may lead to new jobs or increased tax revenue).

Tal's addition of new defendants in federal court also does not change the nature of the underlying state court ruling which upheld the validity of the condemnation. *Lavasek v. White*, 339 F.2d 861, 863 (10th Cir. 1965).[12] The state condemnation proceeding need not be final in order to serve as grounds for *Rooker-Feldman* preclusion. *Kenmen Eng'g*, 314 F.3d at 474.

Finally, Tal's challenge to the Renewal Authority's power of condemnation is irrelevant to the present case because the City, not the Renewal Authority, condemned the land. Even if the Oklahoma courts had ignored the allegedly critical differences between the condemnation powers of municipalities and urban renewal authorities, it would not eliminate *Rooker-Feldman* preclusion. The

---

[12] In *Lavasek*, we confronted a challenge to the condemnation of land by the State of New Mexico. There we held:

> The substance of the instant action is not changed by naming as defendants the present public officials and a county. The acts complained of are the outgrowth of a condemnation, judicially sanctioned, and remain the acts of the State of New Mexico through a complete privity of parties. Nor does appellants' claim of a denial of constitutional rights alter the situation.

*Id*.

doctrine would mean nothing if it applied only when federal courts agreed with the state court holding. Tal, Inc. argued its case in the Oklahoma state courts and even raised grounds for post-judgment relief. Its failure in state court does not mean it can now seek to relitigate these issues in federal court. Just the opposite, a loss in state court precludes a second round in federal court.

## III.   Tal, Inc. and Bricktown, Inc.'s Sherman Act claims

Tal, Inc. and Bricktown, Inc. alleged the Developers and Douglas conspired to monopolize in violation of the Sherman Act. Specifically, Tal, Inc. and Bricktown, Inc. claimed Appellees engaged in "bid-rigging" which led to the award of the Bricktown redevelopment contract to the Developers. The district court dismissed Tal, Inc.'s claim for lack of standing and held Defendants were immune from liability for Bricktown, Inc.'s claim under *Parker v. Brown*, 317 U.S. 341 (1943), and the *Noerr-Pennington* doctrine.[13]

### A.    Tal, Inc.'s antitrust standing

Like Tal, Tal, Inc. must allege, *inter alia*, a cognizable antitrust injury to establish standing. *Ashley Creek,* 315 F.3d at 1254 . To establish an antitrust injury, a plaintiff "must allege a business or property injury, an antitrust injury, as defined by the Sherman Act." *City of Chanute*, 955 F.2d at 652. The primary

---

[13] The *Noerr-Pennington* doctrine is drawn from the Supreme Court's opinions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of American v. Pennington,* 381 U.S. 657 (1965).

concern of the antitrust laws is the corruption of the competitive process, not the success or failure of a particular firm. *Brunswick Corp.,* 429 U.S. at 488 ("The antitrust laws . . . were enacted for the protection of competition not competitors.") (internal quotation omitted). Thus, when a company fails because of legitimate competitive forces, it is not entitled to recover under the antitrust laws. Additionally, "only buyers and sellers in the defendants' market are within the target of the antitrust laws." *Comet Mech. Contractors, Inc. v. E.A. Cowen Constr., Inc.*, 609 F.2d 404, 406 (10th Cir. 1980); *see Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 731 (10th Cir. 1973). This excludes secondary or remote injuries, such as those suffered by companies that desire to obtain a subcontract from a company injured by an antitrust violation. *Comet*, 609 F.2d at 406-07.

Tal, Inc. lacks standing because it did not suffer a cognizable antitrust injury. Tal, Inc. was not a buyer or seller in the affected market. Rather, Tal, Inc.'s allegation of an antitrust violation centers around the alleged "bid-rigging" between the Developers and Douglas which resulted in Bricktown, Inc.'s failure to receive the Bricktown redevelopment contract. Tal, Inc. claims it would have benefitted had Bricktown, Inc. received the redevelopment contract because Tal, Inc. would have received redevelopment subcontracts from Bricktown, Inc. and it owned land adjacent to Bricktown, Inc.'s proposed development area of Bricktown which would have increased in value had Bricktown, Inc.'s bid been accepted. This alleged injury, however, is insufficient to support Tal, Inc.'s

-22-

antitrust claim. The fact Tal, Inc. could potentially benefit as a result of a derivative future business relationship with Bricktown, Inc. or through incidental and speculative increases in property value is insufficient to constitute an antitrust injury. *Comet*, 609 F.2d at 406-07. Accordingly, Tal, Inc. lacks standing to bring its antitrust claim.

B. *The dismissal of Bricktown, Inc.'s Sherman Act claim against the Developers and Douglas*

Bricktown, Inc. alleges both the Developers and Douglas engaged in a conspiracy to rig bids in violation of the antitrust laws in order to ensure the Developers were awarded the Bricktown redevelopment contract. The district court determined the Developers and Douglas were immune under the *Parker* and *Noerr-Pennington* immunity doctrines. It also questioned whether Bricktown, Inc. had adequately stated an antitrust claim.

1. *Parker* and *Noerr-Pennington* immunity doctrines

Bricktown, Inc. argues the *Parker* and *Noerr-Pennington* immunity doctrines are unavailable to Appellees because the Developers are private persons and Douglas was acting outside of her official duties. Additionally, it argues these immunity doctrines "do not apply when conspiracy to rig public bids are at issue." (Corporate Br. at 31.)

a.      *Parker* immunity

Generally, a state's anticompetitive actions are immune from civil antitrust laws.  *Parker v. Brown*, 317 U.S. 341, 350-52 (1943).  This federalism-based state immunity can, under certain circumstances, apply to municipalities.  *Cmty. Commc'ns Co. v. City of Boulder, Colo.*, 455 U.S. 40, 51 (1982).  To be protected, a municipality must be "authorized by the State pursuant to state policy to displace competition with regulation or monopoly public service."  *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 39 (1985) (internal quotation omitted).  This requires that the state legislature authorize the challenged action and intend to displace competition with regulation.  *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, Kan.*, 927 F.2d 1111, 1120 (10th Cir. 1991).

In this case, the State of Oklahoma authorized the creation of urban renewal authorities.  11 OKLA. STAT. TIT. §§ 38-101 to -123.  The district court held that the authorizing statutes "clearly contemplate anticompetitive activity."  (Appellants' App., Ex. 3 at 23.)  In support, the district court cited 11 OKLA. STAT. TIT. § 38-108(a) which gives an urban renewal authority the power "[t]o undertake and carry out the urban renewal projects within its area of operation . . . and to make and execute contracts . . . necessary or convenient to the exercise of its powers under this article."

We agree with the district court's analysis.  In an analogous case, *Buckley Construction, Inc. v. Shawnee Civic & Cultural Development Authority*, we upheld

-24-

state immunity for a development authority that coordinated bidding under the Oklahoma Public Competitive Bidding Act of 1974, 61 OKLA. STAT. TIT. §§ 101-136 (1981). 933 F.2d 853, 856 (10th Cir. 1991). We held the Competitive Bidding Act "clearly contemplates anticompetitive activity," in part because the statute "gives the public agency discretion to reject any or all bids if it determines that is in the best interest of the State of Oklahoma." *Id*. Like the Oklahoma Competitive Bidding Act at issue in *Buckley Construction*, the statute at issue in this case gives urban renewal authorities the discretion to make contracts "necessary or convenient to the exercise of its powers." This language has a foreseeable anticompetitive effect no less than the Competitive Bidding Act which was found to confer immunity in *Buckley Construction*. Thus, the Renewal Authority was not required to select the lowest bidder for the redevelopment contract if it was not "convenient to the exercise of its powers." Consequently, Douglas, as the executive director of the Renewal Authority, is entitled to *Parker* immunity, regardless of anticompetitive results or intent, assuming her actions were in furtherance of her Renewal Authority responsibilities.

Bricktown, Inc. alleges Douglas was acting outside of her official responsibilities by engaging in "bid-rigging." However, no facts support Bricktown, Inc.'s claim, and there is no evidence Douglas had a personal interest in the contract being awarded to the Developers. Moreover, the city council approved her actions by adopting resolutions in support of the Developers' proposal. Bricktown, Inc.'s

naked allegations of a "bid-rigging" conspiracy do not render Douglas' actions outside of her official duties and thus do not deprive her of immunity.

b.    *Noerr-Pennington* immunity

A corollary of *Parker* immunity is the *Noerr-Pennington* doctrine, which "exempts from antitrust liability any legitimate use of the political process by private individuals, even if their intent is to eliminate competition." *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1503 (10th Cir. 1997); *see also City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379-80 (1991).  The doctrine is grounded in the First Amendment and "arises from the [Supreme] Court's conclusion that the Sherman Act was not intended to derogate the First Amendment right of citizens to petition the government for a redress of grievances." *GF Gaming Corp.,* 405 F.3d at 883.  The actual intent of the parties petitioning the government or of the government agent involved is irrelevant.  *City of Columbia*, 499 U.S. at 380; *Zimomra*, 111 F.3d at 1503.

Of course, this immunity does not encompass fraudulent or illegal actions. *Oberndorf v. City & County of Denver*, 900 F.2d 1434, 1440 (10th Cir. 1990).  But, to establish fraud or illegality, there must be more than a mere allegation of a "conspiracy."  *City of Columbia*, 499 U.S. at 383.  "[C]ultivating close ties with government officials is the essence of lobbying." *Boone v. Redevelopment Agency of the City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988).  "It would be unlikely that any effort to influence legislative action could succeed unless one or more

-26-

members of the legislative body became . . . co-conspirators in *some* sense with the private party urging such action." *City of Columbia*, 499 U.S. at 383. Therefore, "[f]or purposes of *Noerr-Pennington*, there is no distinction between petitioning government officials and conspiring with them." *GF Gaming Corp.,* 405 F.3d at 883.

Bricktown, Inc. argues the Developers are not entitled to *Noerr-Pennington* immunity because they are private entities and because *Noerr-Pennington* immunity does not apply when a "conspiracy to rig public bids [is] at issue." (Corporate Br. at 31.) However, Bricktown, Inc. is clearly wrong that the *Noerr-Pennington* doctrine does not apply to private entities; that is precisely for whom the immunity was created. *Zimomra,* 111 F.3d at 1503. Nor does the fact the alleged antitrust violation is a "bid-rigging" claim automatically remove it from *Noerr-Pennington* immunity.[14] The Developers, even though potentially acting with anticompetitive intent, are covered under the *Noerr-Pennington* doctrine unless there is some colorable claim of fraud or illegality. In this case, there is only an allegation the Developers participated in an abstract "bid-rigging conspiracy." Bricktown, Inc. does not proffer any facts that, if credited, would support the charge of conspiracy

---

[14] Perhaps Bricktown, Inc. believes immunity is unavailable because "bid-rigging" has been held a *per se* violation of Section 1 of the Sherman Act. *United States v. Flom*, 558 F.2d 1179, 1183 (5th Cir. 1977); *United States v. Finis P. Ernest, Inc.*, 509 F.2d 1256, 1261 (7th Cir. 1975). But a *per se* violation only means that *if* the Developers are found to be guilty of the complained conduct, they can offer no business justification, not that they cannot assert immunity.

or indicate any fraudulent behavior on the part of the Developers or Douglas. Bricktown, Inc.'s only specific factual allegations are that the Developers "made two out of the five Urban Renewal's Commissioner[s] partners in a number of business ventures; managed an office building of a third Commissioner below market value; and similarly, [were] the landlord[s] of Urban Renewal and leased it office space in one [of] the Hogan Team's downtown buildings below market value." (Corporate Br. at 37.)

According to the Developers, Bricktown, Inc. is merely complaining that they "vigorously petitioned [the Renewal Authority] to consider [their] proposal for the development of South Bricktown, lobbied the city council in promotion of [their] development proposal, lobbied the city council to adopt the resolutions that would be necessary to implement that proposal, and made legal campaign contributions." (Developers' Br. at 31.) We agree and reject Bricktown, Inc.'s challenge to the district court's application of *Noerr-Pennington* immunity.

2. Failure to adequately plead an antitrust violation

Even if the Developers and Douglas were not immune under *Parker* and *Noerr-Pennington*, Bricktown, Inc. failed to allege sufficient facts to support its antitrust claim. Bricktown, Inc. alleges it adequately plead an antitrust violation because it "clearly alleged that the Defendants engaged in a conspiracy scheme of bid-rigging (pre-determined before publication of bid), and that the submission of TMK/Hogan's RFP Proposal was collusive, fabricated, and non-competitive."

(Corporate Br. at 31.)

"A complaint is subject to dismissal where it does little more than recite the relevant antitrust laws." *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992) (internal quotation omitted). Conclusory allegations are insufficient. *Id*. at 1024. Bare bones accusations of a conspiracy without any supporting facts are insufficient to state an antitrust claim. *Mountain View Pharmacy v. Abbott Labs.*, 630 F.2d 1383, 1388 (10th Cir. 1980). Moreover, "[t]he use of antitrust 'buzz words' does not supply the factual circumstances necessary to support . . . conclusory allegations." *TV Commc'ns*, 964 F.2d at 1026.

Bid-rigging has been found to violate Section 1 of the Sherman Act when two or more competitors coordinate their bids to a third party. *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 869 (10th Cir. 1989). However, Bricktown, Inc.'s bid-rigging antitrust claim suffers from the lack of factual support.[15] Its bald allegations of "conspiracy" and "bid-rigging" are insufficient to support an antitrust claim and are no better than claiming that the defendants violated "the antitrust laws" in the abstract. Indeed, Douglas had no economic interest in the Developers receiving the bid as she was not a competitor or owner, nor was there any evidence of bribery. At best, the conduct complained of includes the Developers' zealous

---

[15] An additional problem with Bricktown, Inc.'s claim is that the alleged bid-rigging involved Douglas who was a third party, and not a competitor. A traditional bid-rigging claim involves collusion among competitors *against* the third party who requested the bid. *See Mobile Materials*, 881 F.2d at 869.

lobbying of the city council to approve their proposed renovation plan. This conduct does not constitute collusion among competitors to fix a bid price, nor is there anything illegal about lobbying. Absent specific factual allegations that support a claim of bid-rigging, Bricktown, Inc.'s use of antitrust buzz-words and parroting of general antitrust theories is insufficient to support a Sherman Act violation.

## IV.  Tal, Inc. and Bricktown, Inc.'s Rico Claims

As stated previously, Tal, Inc. and Bricktown, Inc. brought RICO claims against the Developers under 18 U.S.C. § 1962(b), against Douglas under 18 U.S.C. § 1962(c) and against the Developers and Douglas under 18 U.S.C. § 1962(d). The elements of a civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity. 18 U.S.C. § 1962(a), (b), & (c).[16] "Racketeering activity" is defined in 18 U.S.C. § 1961(1)(B) as any "act which is indictable" under federal law and specifically includes mail fraud, wire fraud and racketeering. These underlying acts are "referred to as predicate acts, because they form the basis for liability under RICO." *BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1102 (10th Cir. 1999) (internal

_____

[16] Under 18 U.S.C. § 1964(c), persons injured in their business or property by reason of a violation of § 1962 may bring a RICO claim and recover treble. damages, costs and attorney's fees.

quotation omitted). "[A] person does not have to be formally convicted of any predicate act before liability under 18 U.S.C. § 1962[] may attach."[17]  *Id.*

In the Second Amended Complaint and RICO Case Statement,[18] Bricktown, Inc. and Tal, Inc. alleged the Developers and Douglas engaged in predicate acts of mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343 and bribery in violation of 18 U.S.C. § 201.[19]  Specifically, Bricktown, Inc.

---

[17] The Developers urge this Court to require an indictability standard in the pleadings.  The district court of Utah has required a plaintiff to show "that a party has committed at least two indictable acts."  *Bache Halsey Stuart Shields, Inc., v. Tracy Collins Bank & Trust Co.*, 558 F.Supp. 1042, 1045 (D. Utah 1983) (internal quotation omitted).  Thus, "a party must allege two acts of 'racketeering' with enough specificity to show there is probable cause the crimes were committed.  An offense is not 'indictable' merely because it is alleged.  Rather, to be indictable it must be 'well-founded' and based on probable cause."  *Id.*  This pleading standard, however, has never been adopted by this Court and has been expressly rejected by the seventh circuit.  *Haroco, Inc. v. Am. Nat'l. Bank & Trust Co. of Chicago*, 747 F.2d 384, 403-04 (7th Cir. 1984).  Although such a standard would make this case easier to dispose of, a heightened pleading requirement is not necessary to affirm the district court's ruling, and we decline to consider it here.

[18] When evaluating the sufficiency of pleadings under Rule 12(b)(6) of the Federal Rules of Civil Procedure, we may consider the allegations made in a plaintiff's RICO Case Statement in conjunction with the complaint.  *See Fox v. Maulding*, 112 F.3d 453, 460 (10th Cir. 1997).

[19] Bricktown, Inc. and Tal, Inc. also argue the City's allegedly fraudulent condemnation of Tal, Inc.'s land constitutes a predicate act for purposes of RICO, relying on *Pelfresne v. Stephens*, 35 F.Supp.2d 1064 (N.D. Ill. 1999).  However in this case, unlike in *Pelfresne*, we are confronted with a state court determination that the condemnation of Tal, Inc.'s land was proper and are barred by the *Rooker-Feldman* doctrine from reconsidering this determination on its merits.  We cannot consider the condemnation as a possible predicate act without calling into question the validity of the state court judgment.  Thus, Tal, Inc.'s allegation that the condemnation was fraudulent and constituted a predicate act for RICO

-31-

and Tal, Inc. allege the Developers fraudulently procured the Bricktown redevelopment contract by misrepresenting to the Renewal Authority and the city council that they were backed by Torchmark Corporation. They also allege the Developers "acquired or maintained . . . interest in or control over" the Renewal Authority and the city council through bribery. (Appellants' App., Ex. 1 at 58.) The district court dismissed the subsection (b) claim against the Developers for failure to specifically allege predicate acts and failure to show an interest in or control over the Renewal Authority or the city council. It dismissed the subsection (c) claim against Douglas for failure to specifically allege predicate acts and failure to show a continuing threat to other parties from the alleged RICO activities. The district court also dismissed the subsection (d) claim against the Developers and Douglas for failing to sufficiently allege a predicate violation of subsections (b) or (c). Because subsections (b) and (c) both require allegations of racketeering activity, we first determine whether Bricktown, Inc. and Tal, Inc. sufficiently

---

purposes is inextricably intertwined with the state court judgment and precluded by *Rooker-Feldman*. *See Kenmen Eng'g*, 314 F.3d at 473 (precluding claims inextricably intertwined with state court case); *Fox*, 112 F.3d at 460 (excluding RICO claim barred by failure to raise issue in state court). As to Bricktown, Inc.'s use of the condemnation claim as a predicate act, it also fails because the City, which was responsible for the condemnation, is not a named defendant but is the alleged "enterprise." The defendant must be separate from the enterprise. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161-63 (2001); *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1146 (10th Cir. 1998); *Bd. of County Comm'rs of San Juan County v. Liberty Group*, 965 F.2d 879, 885 (10th Cir. 1992). This is true even if we credited Plaintiffs' statement that the Renewal Authority was also involved in the fraudulent condemnation.

alleged predicate acts that can serve as a basis for RICO liability.

   A.     *Pattern of racketeering activity*

   Plaintiffs allege Defendants engaged in predicate acts of mail fraud, wire fraud and bribery.  To establish the predicate act of mail fraud, Bricktown, Inc. and Tal, Inc. must allege "(1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 892 (10th Cir. 1991).  *See United States v. Kennedy*, 64 F.3d 1465, 1475 (10th Cir. 1995).  "The elements of wire fraud are very similar, but require that the defendant use interstate wire, radio or television communications in furtherance of the scheme to defraud." *BancOklahoma Mortgage Corp.*, 194 F.3d at 1102 (internal quotation omitted).

> [T]he common thread among . . . these crimes is the concept of "fraud." Actionable fraud consists of (1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and (9) injury.

*Id*. at 1103.  Failure to adequately allege any one of the nine elements is fatal to the fraud claim.

   The particularity requirement of Rule 9(b), Federal Rules of Civil Procedure,

applies to claims of mail and wire fraud.[20]  *Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002); *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 989-90 (10th Cir. 1992); *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir. 1989).  Thus, "a complaint alleging fraud [must] 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'"  *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting *Lawrence Nat'l Bank v. Edmonds (In re Edmonds),* 924 F.2d 176, 180 (10th Cir. 1991)).  A plaintiff asserting "fraud must also identify the purpose of the mailing within the defendant's fraudulent scheme." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992).

The federal anti-bribery statute, 18 U.S.C. § 201(b), requires the bribes to be directed toward "public official[s]" or "person[s] . . . selected to be a public official" within the meaning of 18 U.S.C. § 201(a).[21]  Section 201(a) generally limits application of the federal bribery statute to federal officials or persons "acting for or on behalf of the United States, or any department, agency or branch of Government thereof . . . ."  18 U.S.C. § 201(a)(1).

---

[20]"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally." FED. R. CIV. P. 9(b).

[21] 18 U.S.C. § 201(a)(2) provides that "the term 'person who has been selected to be a public official' means any person who has been nominated or appointed to be a public official, or has been officially informed that such person will be so nominated or appointed. . . ."

To determine whether any particular individual falls within this category, the proper inquiry is not simply whether the person had signed a contract with the United States or agreed to serve as the Government's agent, but rather whether the person occupies a position of public trust with official federal responsibilities. Persons who hold such positions are public officials within the meaning of section 201 and liable for prosecution under the federal bribery statute.

*Dixson v. United States*, 465 U.S. 482, 496 (1984). The federal anti-bribery law also applies to bribes offered to state and local officials if the "organization, government, or agency receives in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b).

Bricktown, Inc. and Tal, Inc. set forth their allegations of predicate acts in Section X of their Second Amended Complaint. In support of their mail fraud allegation, Bricktown, Inc. and Tal, Inc. listed forty-six letters with descriptions of the parties, dates and general statements concerning the title or contents of the letters. Tal, Inc. and Bricktown, Inc.'s allegations of mail fraud center around the alleged "Torchmark misrepresentation."

The "Torchmark misrepresentation" consists of TMK/Hogan's alleged intentional misrepresentation to the Renewal Authority and the city council during the bidding process that it "was backed by the $11 billion Torchmark Corporation," (Appellants' App., Ex. 2 at 2), which Tal, Inc. and Bricktown, Inc. allege "was a major factor in [its] selection as [a] developer for the project, and in Plaintiffs' failure to be selected as [the] developer . . . ." (*Id.*, Ex. 1 at 29.) Tal, Inc. and

Bricktown, Inc. alleged that Stonegate, not Torchmark was "the true 50% partner [with] Defendant Hogan Property in Defendant TMK/Hogan." (*Id*., Ex. 2 at 3.) In other words, "Defendants' Torchmark Misrepresentation stated that Defendant TMK/Hogan is a 50/50 joint venture between Defendant Hogan Property and Torchmark Development Corporation, and not between Defendant Hogan Property and Defendant Stonegate, as the official Oklahoma Secretary of State's record shows."[22] (*Id*. at 5.)

In support of their "Torchmark misrepresentation" claim, Tal, Inc. and Bricktown, Inc. alleged Hogan sent a letter to the Renewal Authority on July 26, 1996, detailing TMK/Hogan's qualifications and financial responsibility which included a statement that "Defendant TMK/Hogan's 50% partner was Defendant TDC, identified by Defendants therein as 'a wholly owned subsidiary' of Torchmark." (*Id*., Ex. 1 at 14-15.) Tal, Inc. and Bricktown, Inc. also alleged Hogan and Elgin mailed various financial documents detailing information about Torchmark on several occasions.[23] This material itself is not alleged to have been false, but rather was used in support of the initial misrepresentation.

In the district court, the Developers argued Stonegate was a wholly owned subsidiary of Torchmark. In support, they cited to the public records of the

---

[22]Stonegate refers to Stonegate Management Company, LLC.

[23] These primarily included Torchmark's 1995 through 1998 10-K Annual Report and Financial Statements. (*Id*. at 47-48.)

Alabama Secretary of State which allegedly show that Torchmark formed TDC on June 10, 1988, and was subsequently merged into TDC Company, LLC, on November 24, 1999. Further, they argued that Oklahoma County Clerk records indicated that TDC and Hogan Property Management filed a Fictitious Name Certificate on January 12, 1996, which stated that those entities "associated themselves as partners under the name of TMK/ Hogan Joint Venture."[24] (Appellees' Supp. App. Vol IV at 0966 (internal quotation omitted).) The Developers also alleged that TDC assigned its interest in TMK/Hogan in November 1996 to its wholly-owned subsidiary Stonegate Management Corporation which was then merged into Stonegate Management Company, LLC.

The Second Amended Complaint acknowledged that Stonegate Management

---

[24] Exhibits attached to a complaint are properly treated as part of the pleadings for purposes of ruling on a motion to dismiss. *Indus. Constructors Corp. v. United States Bureau of Reclamation*, 15 F.3d 963, 964-65 (10th Cir. 1994). Ordinarily, consideration of material attached to a defendant's answer or motion to dismiss requires the court to convert the motion into one for summary judgment and afford the parties notice and an opportunity to present relevant evidence. FED. R. CIV. P. 12(b); *David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996). However, facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. *See Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 n.1 (10th Cir. 2004) (citing 27A Fed. Proc., L.Ed. § 62:520 (2003)). This allows the court to "take judicial notice of its own files and records, as well as facts which are a matter of public record." *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001). However, "[t]he documents may only be considered to show their contents, not to prove the truth of matters asserted therein." *Oxford Asset Mgmt., Ltd v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

Company was formed on November 22, 1999, and Stonegate Management

Corporation was merged into it on November 24, 1999. It also alleged TDC

Company, LLC, was created on November 22, 1999, and merged with Torchmark

Development Corporation on November 24, 1999. But the complaint specifically

alleged there was no affiliation between Stonegate and Torchmark Development.[25]

According to Tal, Inc. and Bricktown, Inc., the purpose of the separate creation and

mergers of Torchmark Development Corporation, Torchmark Development

Company, Stonegate Management Corporation and Stonegate Management

Company was to "retroactively cover up and conceal [the] Torchmark

Misrepresentation . . . by representing that Defendant Elgin Development is the

owner of Defendant TDC and that TDC wholly owns Defendant Stonegate."

(Appellants' App., Ex. 2 at 3.)

The district court's order did not specifically address the "Torchmark

misrepresentation." Rather, it found that none of the alleged mail communications

sufficiently pled fraud with particularity. We disagree. The details of the

"Torchmark misrepresentation" alleged in the Second Amended Complaint coupled

with the documents listed in support of that claim sufficiently satisfy Rule 9(b)'s

requirements. Tal, Inc. and Bricktown, Inc. identified the parties, the dates, the

---

[25] According to the Second Amended Complaint, "TMK/Hogan's two partners, as of 1996, were Defendants Hogan Property and Stonegate, and not . . . any entity affiliated with Torchmark." (*Id.* at 15.)

-38-

content of the communications, how they were allegedly fraudulent and how they furthered the fraudulent enterprise. Although the Developers' argument that Stonegate is a wholly owned subsidiary of Torchmark may be fully borne out by the public records of Alabama and Oklahoma, we decline to consider these materials.[26] Rule 12(b)(6) motions to dismiss are not designed to weigh evidence or consider the truth or falsity of an adequately pled complaint. *Sutton,* 173 F.3d at 1236. This is especially controlling in the face of a direct claim to the contrary in the complaint and in the absence of a ruling on the issue from the district court. Thus, Tal, Inc. and Bricktown, Inc. sufficiently alleged an act of mail fraud based on the alleged "Torchmark misrepresentation."

In addition, we agree with the district court that the May 18, 1998 letter authored by Mr. Tolbert, which was allegedly caused to be mailed by the Developers, satisfies the requirements of Rule 9(b). This letter allegedly supported TMK-Hogan's earlier fraudulent statement on July 17, 1997— that the Bricktown Association was a partner with TMK/Hogan. (Appellants' App., Ex. 1 at 36-37.)

---

[26] Even assuming that Stonegate is a wholly owned subsidiary of Torchmark, that fact does not necessarily foreclose a claim of misrepresentation. Tal, Inc. and Bricktown, Inc. might still have a claim if the bid submitted to the Renewal Authority by the Developers claimed Torchmark was a partner in TMK/Hogan, when in fact Stonegate, a wholly owned subsidiary of Torchmark, was Hogan's partner at the time of the bid. Whether the listing of a parent of a wholly owned subsidiary as a partner in a development company, rather than the actual subsidiary partner, in a bid constitutes misrepresentation is an issue we decline to address.

Like the "Torchmark misrepresentation," this allegedly false statement was designed to increase the appeal of TMK/Hogan as a developer and help it secure the award of the development contract.

As to the remaining letters, we again agree with the district court that they "appear to be innocuous business communications." (Appellants' App., Ex. 3 at 13.) While the Second Amended Complaint references these letters their fraudulent nature is not apparent on their face. This is especially problematic because Tal, Inc. and Bricktown, Inc. not only failed to allege how these communications were fraudulent but also how they specifically furthered the fraudulent enterprise. Moreover, eighteen of the forty-six exchanges occurred after July 21, 1998, the date the contract was awarded to the Developers. Thus, the eighteen post-award letters were at best concealment and could not have been used "for the purpose of executing the scheme." *See Kann v. United States,* 323 U.S. 88, 94-95 (1944); *United States v. Cardall*, 885 F.2d 656, 680-82 (10th Cir. 1989). Therefore, Bricktown, Inc. and Tal, Inc.'s allegations of mail fraud as a predicate act are limited to the documents involving the Torchmark and Bricktown Association misrepresentations.

In support of their wire fraud allegation, Bricktown, Inc. and Tal, Inc. list twenty-seven telephone calls, emails, faxes and cable broadcasts involving Appellees and the process granting the development contract to the Developers. All but three of the electronic transmissions relied upon suffer from the same problems

as the majority of the communications supporting the mail fraud claim.  Only three were alleged with sufficient particularity to establish cognizable claims for wire fraud: (1) the August 1, 1997 submission by Douglas to the city council of a fax sent to Douglas by TMK/Hogan, (Appellants' App., Ex. 1 at 32-33); (2) the August 5, 1997 broadcast of the city council meeting where Douglas allegedly made an intentionally fraudulent statement about her role in the selection process, (*id.* at 33, 53); and (3) telephone conversations occurring between May 11, 1998, and May 18, 1999, between Hogan, Elgin and Douglas and Mr. Tolbert, the president of the Bricktown Association.  (*Id.* at 36, 54.)  Unlike the other twenty-four wire communications alleged (and the forty-six letters), these three communications not only describe the date, the parties to the communication and the subject matter, but also how they were fraudulent and what they were designed to accomplish.  Thus, Bricktown, Inc. and Tal, Inc. adequately alleged three acts of mail fraud in violation of 18 U.S.C. § 1343.

In support of their bribery claim under 18 U.S.C. § 201, Bricktown, Inc. and Tal, Inc. list ten actions by both the Developers and members of the Renewal Authority, including Douglas, that arguably benefitted each other.[27]  However,

---

[27] Included in these acts are: (1) the renting of office space to the Renewal Authority at below-market rates; (2) bribing Renewal Authority Commissioner Hall by making him a 50% partner in an East Wharf development project; (3) bribing Renewal Authority Commissioner Nichols by offering the Mid-American Tower at below-market rates; (4) securing Commissioner Talbot a position on the Myriad Garden Trust and the Renewal Authority; (5) bribing Councilman

Douglas, the Renewal Authority Commissioners and the city council are all municipal state actors with no ties to federal programs apparent from the pleadings. This is fatal to Bricktown, Inc. and Tal, Inc.'s bribery claim because they fail to adequately allege that the relevant parties are "public officials" or acting on behalf of the federal government under 18 U.S.C. § 201(a) or § 666. Bricktown, Inc. and Tal, Inc. conceded to the district court that they could not state a claim against Douglas under the federal anti-bribery statute but argued she violated a state anti-bribery statute.[28] While violations of state bribery laws can serve as predicate acts under RICO, *see United States v. Welch*, 327 F.3d 1081 (10th Cir. 2003), the plaintiffs failed to plead that Douglas had violated a state anti-bribery statute in either their RICO Case Statement or their Second Amended Complaint. Additionally, as noted by the district court, Bricktown, Inc. and Tal, Inc. never requested leave to amend their complaint in order to allege a violation of a state anti-bribery statute. (Appellants' App., Ex. 3 at 14.)

---

Liebmann by contributing to a political fundraiser which led to his appointment to political positions with various City trusts; and (6) bribing Mayor Humphreys.

[28] Specifically, they allege Douglas violated 21 OKLA. STAT. TIT. § 381 which makes it a felony to:

> give[], offer[], or promise[] to any executive, legislative, county, municipal, judicial, or other public officer, or any employee of the State of Oklahoma or any political subdivision thereof, . . . any gift or gratuity whatever, with intent to influence his act, vote, opinion, decision, or judgment on any matter, question, cause, or proceeding which then may be pending, or may by law come or be brought before him in his official capacity . . . .

Bricktown, Inc. and Tal, Inc.'s belated request on appeal that "if the Court finds that some of the allegations stated in the almost 300 paragraphs and sub-paragraphs are not too clear, at the least, the Court should point to the unclear allegations and permit the Appellants to amend and clarify these issues," comes too late to offer escape from an adverse Rule 12(b)(6) order. (Corporate Br. at 43.) Bricktown, Inc. and Tal, Inc. could and should have sought leave to amend their Second Amended Complaint with the district court, not with this Court on appeal. *See The Tool Box, Inc. v. Ogden City Corp.*, 419 F.3d 1084, 1088 (10th Cir. 2005) ("Courts have refused to allow a postjudgment amendment when, as here, the moving party had an opportunity to seek the amendment before entry of judgment but waited until after judgment before requesting leave.") Thus the only allegations sufficient to support a claim of a predicate act are the letters involving the Torchmark and Bricktown Association misrepresentations and the three wire communications which allege Douglas, Hogan and Elgin engaged in wire fraud.

As a final point, we question whether Plaintiffs' allegations of predicate acts satisfied the requirement of "a *pattern* of racketeering activity." A "pattern" of racketeering is defined as "at least two acts of racketeering activity, . . . which occurred within ten years" of each other. 18 U.S.C. § 1961(5). However, because "RICO is not aimed at the isolated offender," *Resolution Trust Corp.*, 998 F.2d at 1544, proof of two or more predicate acts are not sufficient to prove a pattern unless there is a relationship between the predicate acts and a threat of continuing activity.

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *Duran v. Carris*, 238 F.3d 1268, 1271 (10th Cir. 2001). Continuity of threat requires both proof of "a series of related predicates extending over a substantial period of time," as well as a "showing that the predicates themselves involve a distinct threat of long-term racketeering activity . . . or that the predicates are a regular way of conducting the defendant's ongoing legitimate business or the RICO enterprise." *Resolution Trust Corp.*, 998 F.2d at 1543. To determine continuity we examine both the duration of the related predicate acts and the extensiveness of the RICO enterprise's scheme. *Id*. In determining the extensiveness of the predicate acts we consider a variety of factors as well as "external facts that are not necessarily charged as predicate acts." *Id*. at 1544.

Here, none of the Appellants specifically allege a continuing threat by the Developers and Douglas to control the Renewal Authority and the city council. The allegations are confined to the award of one, albeit large, development contract to the Developers. There is no reason to believe that the grant of one development contract acquired through misrepresentation of financial backing and partnership constitutes "a distinct threat of long-term racketeering activity." *Id*. at 1543. In theory, we could consider material outside of the alleged predicate acts to find a more extensive threat to the Renewal Authority and the city council. *Id*. at 1544. However, because the extensiveness of the threat is a question of fact, *id*., we will assume for the purposes of this opinion that the predicate acts alleged by Bricktown,

-44-

Inc. and Tal, Inc. establish a pattern of racketeering activity. We next consider whether the pattern of racketeering activity states a claim under 18 U.S.C. § 1962(b), (c), or (d).

B.    *Section 1962(b)*

18 U.S.C. § 1962(b) makes it illegal for "any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in . . . interstate . . . commerce." The purpose of the statute is "to prohibit efforts to muscle in on legitimate business through the commission of a pattern of racketeering activity." SMITH & REED, CIVIL RICO, ¶6.04[5][b]. To state a claim under section 1962(b), the plaintiff must allege the defendant (1) acquired or maintained an interest in or control of (2) an enterprise engaged in interstate commerce (3) through a pattern (4) of racketeering activity, or collection of an unlawful debt. *See Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 296 (3d Cir. 1991). As with other section 1962 claims, the injury must be attributable to the prohibited action. *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1231 (D.C. Cir. 1991).

Section 1962(b) claims are relatively uncommon because the first element requires sufficient allegations of "an interest in or control of" an enterprise, as opposed to the less demanding requirement of "association" with the enterprise in section 1962(c) claims. "Interest in or control of" requires more than a general

interest in the results of its actions, or the ability to influence the enterprise through deceit. *See Univ. of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539-40 (3d Cir. 1993) (allegedly preparing false financial statements on behalf of the enterprise is not participation). Rather, it requires some ownership of the enterprise or an ability to exercise dominion over it.[29]

Bricktown, Inc. and Tal, Inc.'s claims founder on the combination of elements (1) and (4). They failed to adequately allege Appellees acquired or maintained an interest in or control of the Renewal Authority or the city council *through* the predicate acts. Bricktown, Inc. and Tal, Inc.'s alleged three acts of wire fraud fall short of demonstrating control of or an interest in the Renewal Authority and the city council; at best they show a misrepresentation to those bodies. Perhaps the allegations of bribery might have been sufficient to demonstrate an interest in or

---

[29] *See United States v. Jacobson*, 691 F.2d 110, 113 (2d Cir. 1982) ("'interest' in fact encompasses all 'property rights' in a business enterprise" for purposes of § 1962(b)); *United States v. Martino*, 681 F.2d 952, 954 (5th Cir. 1982) (en banc) (participation in the advantage, profit and responsibility of the enterprise is an "interest"); *Moffatt Enters., Inc. v. Borden Inc.*, 763 F.Supp. 143, 147 (W.D. Pa. 1990) ("it is clear that the 'interest' contemplated in . . . § 1962(b) is in the nature of a proprietary one, such as the acquisition of stock, and that the 'control' contemplated is in the nature of the control one gains through the acquisition of sufficient stock to affect the composition of a board of directors."). *But see*, *Ikuno v. Yip*, 912 F.2d 306, 310 (9th Cir. 1990) ("control within the meaning of § 1962(b) need not be formal control and 'need not be the kind of control that is obtained, for example, by acquiring a majority of the stock of a corporation.'") (quoting *Sutliff, Inc. v. Donovan Co.*, 727 F.2d 648, 653 (7th Cir. 1984)).

control of the Renewal Authority or the city council,[30] if they had been adequately plead. But in the absence of sufficient allegations of bribery, Bricktown, Inc. and Tal, Inc. did not adequately allege the defendants acquired or maintained an interest in or control of the Renewal Authority or the city council based on the three alleged acts of wire fraud.

    *C.    Section 1962(c)*:

18 U.S.C. § 1962(c) makes it illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." To survive a Rule 12(b)(6) motion, a civil RICO claim must allege the defendants (1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Cayman Exploration Corp.,* 873 F.2d at 1362; *see Sedima, S.P.R.L.,* 473 U.S.at 496. The Supreme Court has adopted the "operation or management" test to determine whether the defendant has conducted or participated in the conduct of the enterprise by having some part in directing the affairs of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). "For liability to be imposed under that test, the defendants must have participated in the operation or

---

[30] *But see In re Am. Honda Motor Co., Inc. Dealerships Relations Litigation*, 941 F.Supp. 528, 556 (D. Md. 1996) (holding bribery fails to establish investment in or acquiring interest in an enterprise for RICO purposes).

management of the RICO enterprise," *BancOklahoma Mortgage Corp.*, 194 F.3d at 1100, "although it is not necessary for the participant to have significant control." *Resolution Trust Corp.,* 998 F.2d at 1541(internal quotation omitted).

In this case, Bricktown, Inc. and Tal, Inc. have failed to allege sufficient predicate acts to establish Appellees participated in the operation or management of the Renewal Authority or the city council.  All the alleged predicate acts relate to TMK/Hogan's bid for the award of the Bricktown development contract, and at most involve an attempt to influence the Renewal Authority and the city council through misrepresentations, not through operation or management.  Misrepresenting material facts to influence a selection process is a serious allegation to be sure, but does not rise to the level of participation in the operation or management of the Renewal Authority and the city council.  Again, had Appellants adequately alleged Douglas was involved in any of the predicate acts, this would be a different case, as it would be if the Appellants had adequately alleged bribery.  *See Resolution Trust Corp.*, 998 F.2d at 1542 (holding chief executive officer of the enterprise participated in the conduct of the enterprise); *Reves*, 507 U.S. at 184 (noting "[a]n enterprise also might be operated or managed by others associated with the enterprise who exert control over it . . . by bribery.") (internal quotations omitted).  As it stands, Appellants' allegations of mail and wire fraud fail to establish a violation of § 1962(c).

> D.      *Section 1962(d)*:

18 U.S.C. § 1962(d) makes it illegal "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Tal, Inc. and Bricktown, Inc.'s § 1962(d) claim also fails. By its terms, § 1962(d) requires that a plaintiff must first allege an independent violation of subsections (a), (b), or (c), in order to plead a conspiracy claim under subsection (d). *See United States v. Hampton*, 786 F.2d 977, 978 (10th Cir. 1986) ("The object of a RICO conspiracy must be to violate a substantive RICO provision."); *Schroder v. Volcker*, 864 F.2d 97, 98 (10th Cir. 1988). If a plaintiff has no viable claim under § 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a matter of law. *See Condict v. Condict*, 826 F.2d 923, 927 (10th Cir. 1987) ("[A]ny claim under § 1962(d) based on a conspiracy to violate the provisions of 18 U.S.C. § 1962(a), (b), or (c) must necessarily fall if the substantive claims are themselves deficient."); *BancOklahoma Mortgage,* 194 F.3d at 1103*; Edwards v. First Nat'l Bank, Bartlesville, Okla.*, 872 F.2d 347, 352 (10th Cir. 1989); *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1151 (10th Cir. 1989); *Torwest DBC, Inc. v. Dick*, 810 F.2d 925, 927 n.2 (10th Cir. 1987). Because Appellants have failed to allege a sufficient claim under subsections (b) or (c), their subsection (d) conspiracy claim fails as a matter of law.

## V.    Pendant State Law Claims

Tal argues the district court improperly declined to exercise its pendant jurisdiction over the state law claims of fraudulent condemnation and tortious interference with business, because they alleged violations of the Fifth and

Fourteenth Amendments. Conversely, both Douglas and the City argue the tort claim should be dismissed with prejudice. Douglas argues the tort claim is barred by the statute of limitations. The City argues it is barred by the Oklahoma Governmental Tort Claims Act. We need not decide these issues.

The district court was precluded from considering the Appellants' Fifth Amendment claim by the *Rooker-Feldman* doctrine. As for the other state law tort claims, we note that "[t]he Fourteenth Amendment [is not] a font of tort law." *Daniels v. Williams*, 474 U.S. 327, 332 (1986). Additionally, the court was not required to consider either the merits or the procedural issues attendant to the state law claims. Because the district court properly dismissed all of Appellants' federal claims, it was well within its discretion under 28 U.S.C. § 1367(c)(3) to decline to exercise supplemental jurisdiction over plaintiffs' state-law claims. *Exum v. United States Olympic Comm.,* 389 F.3d 1130, 1138-39 (10th Cir. 2004); *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1236 (10th Cir. 1998). The court, therefore, did not err in dismissing the state interference with business claims without prejudice.

## CONCLUSION

We **AFFIRM** the district court's dismissal of Tal's Complaint, and Tal, Inc. and Bricktown, Inc.'s Second Amended Complaint under Rule 12(b)(6) of the Federal Rules Civil Procedure. We also **AFFIRM** the district court's dismissal of the pendant state law claims without prejudice.