**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 2, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee.

v.

RAPOWER-3, LLC; INTERNATIONAL
AUTOMATED SYSTEMS; LTB1; R.
GREGORY SHEPARD; NELDON P.
JOHNSON,

    Defendants - Appellants.

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RAPOWER-3, LLC; INTERNATIONAL
AUTOMATED SYSTEMS; LTB1; R.
GREGORY SHEPARD; NELDON P.
JOHNSON,

    Defendants - Appellants,

and

HEIDEMAN & ASSOCIATES, re 290
Motion,

    Respondent.

_____

No. 18-4119

No. 18-4150

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:15-CV-00828-DN-EJF)**

———————————————

Denver C. Snuffer, Jr. (Steven R. Paul, with him on the briefs), Nelson, Snuffer, Dahle & Poulsen, P.C., Sandy, Utah, for Defendants-Appellants.

Clint A. Carpenter (Richard E. Zuckerman, Principal Deputy Assistant Attorney General, Joan I. Oppenheimer, and John W. Huber, United States Attorney, of Counsel, with him on the briefs), Tax Division, Department of Justice, Washington, D.C., for Plaintiff-Appellee.

———————————————

Before **LUCERO**, **HARTZ**, and **MATHESON**, Circuit Judges.

———————————————

**HARTZ**, Circuit Judge.

———————————————

After a bench trial the district court decided that Defendants—RaPower-3, LLC; International Automated Systems, Inc. (IAS); LTB1, LLC; Neldon Johnson (the sole decision-maker for the preceding entities); and R. Gregory Shepard (who assisted Johnson in marketing and sales for the entities)—had promoted an unlawful tax scheme. To remedy the misconduct, the court enjoined Defendants from continuing to promote their scheme and ordered disgorgement of their gross receipts from the scheme. *See United States v. RaPower-3, LLC*, 343 F. Supp. 3d 1115 (D. Utah 2018). Defendants appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. THE SCHEME

Defendants' tax scheme was based on a supposed project to utilize a purportedly new, commercially viable way of converting solar radiation into electricity. Mr. Johnson's design, as he advertised it, was to install arrays of framed, triangular plastic

2

sheets ("lenses") on towers. The lens arrays would track the sun and focus its radiation onto a "receiver," where it would heat a "heat transfer fluid." *RaPower-3*, 343 F. Supp. 3d at 1124. The transfer fluid would be pumped to a "heat exchanger" to boil water and generate steam. *Id.* at 1125. The steam would spin a turbine to produce electricity, which would be sent onto wires connected to the electricity grid.

From 2006 to 2008, nineteen towers were constructed at a site near Delta, Utah. The evidence showed that the towers had lenses installed on them, but little more. Many of the towers with receivers "ha[d] no collector or mechanism to transmit energy from a receiver to a generator," *id.* at 1124, and Mr. Johnson testified that he had not even determined what substance he would use as the "transfer fluid," *id.* at 1125. There was no connection from the towers to the electricity grid; the only thing at the site was "a brown pole with wires dangling from the top." *Id.* at 1149.

Mr. Johnson testified that he could have "easily" put electricity onto the grid "at any time since 2005," but he had "made a business decision" not to do so. *Id.* at 1147 (internal quotation marks omitted). There was no "third party verification of any of Johnson's designs." *Id.* at 1151. Nor did he have any "record that his system ha[d] produced energy," and "[t]here [were] no witnesses to his production of a useful product from solar energy," a fact that he attributed to his decision to do his testing "on the weekends when no one was around because he didn't want people to see what he was doing." *Id.* (original brackets omitted). Defendant Shepard testified that "the only application that he heard of for [heat from the lenses] was to burn wood, grass, shoes, a man, and a rabbit." *Id.* at 1150.

Needless to say, Defendants never secured a purchase agreement for the sale of electricity to an end user. The district court found that "Johnson's purported solar energy technology is not now, has never been, and never will be a commercial-grade solar energy system that converts sunlight into electrical power or other useful energy." *Id.*

Despite this, Defendants' project generated tens of millions of dollars between 2005 and 2018. At first the money came from individuals leasing lenses from IAS; but beginning in 2006, buyers would purchase lenses from one of Mr. Johnson's entities, IAS or RaPower-3 (or, because Mr. Johnson and Mr. Shepard used a multilevel-marketing structure, from a "downline" marketer who had purchased the lens from IAS or RaPower-3) for a down payment of about one-third of the purchase price. The entity would "finance" the remaining two-thirds of the purchase price with a zero- or nominal-interest, nonrecourse loan. No further payments would be due from the customer until the system had been generating revenue from electricity sales for five years. The customer would agree to lease the lens back to LTB1 for installation at a "Power Plant"; but LTB1 would not be obligated to make any rental payments until the system had begun generating revenue.

The district court found that each plastic sheet for the lenses was sold to Defendants for between $52 and $70, and the correct valuation of each lens was not more than $100, yet the purchase price of a lens was between $3,500 and $30,000. Although Defendants sold between 45,000 and 50,000 lenses, fewer than 5% of them were ever installed. Stacks of uncut plastic sheets were in a warehouse in Utah, and Defendants could not tell which customer owned which lens.

4

Customers were told that buying a lens would have very favorable income-tax consequences. Mr. Johnson and Mr. Shepard sold the lenses by advertising that customers could "zero out" federal income-tax liability by taking advantage of depreciation deductions and solar-energy tax credits.

## II. TAX-LAW IMPLICATIONS

### A. Validity of claimed deductions and credits

The Internal Revenue Code (IRC) provides favorable tax treatment for investments in solar-energy projects and other capital expenditures. But the requirements to qualify are strict, and the government, believing that purchases of lenses for Defendants' project did not satisfy them, filed this action in the United States District Court for the District of Utah seeking injunctive and other equitable relief against Defendants. After a 12-day bench trial in which Defendants did not call any witnesses, the district court agreed with the government.

The district court concluded, as discussed in more detail below, that Defendants had engaged in conduct subject to penalty under 26 U.S.C. § 6700(a)(2)(A) by telling customers that they could claim solar-energy tax credits under 26 U.S.C. § 48 and depreciation deductions under 26 U.S.C. § 167(a), including deductions and credits in excess of both passive income, *see* 26 U.S.C. § 469, and the amounts at risk, *see* 26 U.S.C. § 465. It also concluded that Defendants engaged in conduct subject to penalty under § 6700(a)(2)(B) because they made a gross-valuation overstatement "each time they told someone the price of a lens (whether $9,000, $3,000, or $3,500)." *RaPower-3*, 343 F. Supp. 3d at 1191.

5

The district court determined that Defendants' "customers were not allowed a depreciation deduction or the solar energy credit" for several reasons. *Id.* at 1173. To begin with, "customers were not allowed a depreciation deduction . . . because [they] were not in a 'trade or business' related to the solar lenses and did not hold the lenses for the production of income." *Id.* The court evaluated whether customers had acquired lenses in good faith with the primary purpose of earning a profit. It relied on Tenth Circuit precedent, in particular *Nickeson v. Commissioner*, 962 F.2d 973 (10th Cir. 1992), which identifies factors indicating that an activity is an abusive tax scheme as opposed to a bona fide trade or business. The factors include: "marketing on the basis of projected tax benefits, grossly inflated purchase price set without bargaining, failure of taxpayers to inquire into the potential profitability of the program, taxpayers' lack of control over activities, and use of nonrecourse indebtedness[.]" *Id.* at 977 (citations omitted).

Defendants' project fit the bill. The district court found (1) that the benefits of lens ownership were marketed by reference to "the tax benefits it would provide," *RaPower-3*, 343 F. Supp. 3d at 1181; (2) that "no customer earned or would earn income from buying solar lenses," *id.* at 1174; (3) that "customers had no control over their purported 'lens leasing' businesses," *id.* at 1179; and (4) that "any purported obligation [of the customer] to pay is substantial—and perhaps indefinitely—deferred debt," "[c]ustomers borrow for free," and "the only security for the customers' promise to pay the[] outstanding amounts is the lens itself," *id.* at 1180. The district court concluded that "the solar lenses were a smokescreen for . . . unlawful 'sales' of tax deductions and

6

credits to customers," *id.* at 1182, and that "customers' 'lens leasing' businesses were not bona fide and ongoing businesses," *id.* at 1183.

The district court concluded that depreciation deductions were also not allowed because the lenses were not "placed in service" by the same tax year as the claimed deductions. It relied on Treasury Regulation 26 C.F.R. § 1.167(a)–10(b), which prohibits depreciation deductions unless the property for which the deduction is sought had been "placed in service" by the year that the deduction is claimed. "Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." 26 C.F.R. § 1.167(a)–11(e)(1)(i). The district court evaluated whether the lenses were "placed in service" under the framework articulated in *Sealy Power, Ltd. v. Commissioner*, 46 F.3d 382 (5th Cir. 1995), *action on decision*, AOD-1995-10 (Aug. 7, 1995), *nonacq.*, 1995-33 I.R.B. 4, 1995-2 C.B. 1 (Aug. 14, 1995).

In *Sealy Power* the Fifth Circuit identified five factors from Revenue Rulings for determining when the components of a power-generating system are "placed in service" within the meaning of the Treasury Regulations:

> 1) whether the necessary permits and licenses for operation have been obtained; 2) whether critical preoperational testing has been completed; 3) whether the taxpayer has control of the facility; 4) whether the unit has been synchronized with the transmission grid; and 5) whether daily or regular operation has begun.

7

*Id.* at 395. Because none of these factors was met in Defendants' system and because "the bulk of customers' 'lenses' [were] not installed on towers," the district court concluded they were not "placed in service." *RaPower-3*, 343 F. Supp. 3d at 1184.

For those reasons and one additional, the district court determined that the customers were not entitled to the solar-energy credit under 26 U.S.C. § 48. Taxpayers can claim a credit for a percentage of the "basis" (generally the cost) of qualifying "energy property." 26 U.S.C. §§ 46(2); 48(a)(1), (2)(A)(i)(II). But to qualify for the credit the property must be depreciable, *see id.* § 48(a)(3)(C), and placed in service during the taxable year, *see id.* § 48(a)(1). And, for the reasons just discussed, the lenses did not satisfy either requirement. Moreover, the lenses did not satisfy the requirement that the property be "equipment which uses solar energy to generate electricity, to heat or cool (or provide hot water for use in) a structure, or to provide solar process heat." *Id.* § 48(a)(3)(A)(i). The district court found:

> The preponderance of the credible evidence . . . show[ed] that customers' lenses have never been used in a system that generates electricity, that heats or cools a structure or provides hot water for use in a structure. Nearly all customer "lenses" [were] actually rectangular sheets of plastic sitting in a warehouse, uncut, unframed, and not yet installed on towers. Further, the preponderance of credible evidence show[ed] that even the lenses installed on towers do not "provide solar process heat."

*RaPower-3*, 343 F. Supp. 3d at 1185. Thus, there were at least three reasons why lens customers did not qualify for the solar-energy tax credit.

The district court then concluded that even if lens customers were entitled to depreciation deductions and solar-energy credits, they were not allowed to claim deductions or credits in excess of their income from "passive" activities. The court

8

explained that "§ 469 generally prohibits the deduction of passive activity losses, except insofar as the losses are used to offset passive activity income," and that "[a]ctivity that involves the rental of tangible property is" a passive activity. *RaPower-3*, 343 F. Supp. 3d at 1185–86. Therefore, lens customers were not allowed to use "deductions and credits from purportedly leasing out solar lenses . . . to offset active income or tax on active income." *Id.* at 1185–86.

Finally, the district court concluded that under § 465, lens customers were not allowed to claim deductions or credits in excess of their down payments on the lenses. It explained that losses incurred in connection with certain statutorily enumerated activities, including leasing depreciable property, *see* 26 U.S.C. § 465(c)(1)(C), cannot be deducted from income in excess of the amount that the taxpayer has "at risk" in the activity, *id.* § 465(a). The amount "at risk" is in general the amount of money (and the adjusted basis of property) the taxpayer has contributed to the activity. *Id.* § 465(b). The district court concluded that lens customers had no money at risk because (1) the purchase contracts "contained an explicit statement that a customer could get a refund of all amounts paid in, without penalty, if either IAS or RaPower-3 did not perform on the contract," and (2) there was no enforceable obligation to personally repay the nonrecourse, zero-interest loan used to finance the balance of the purchase price. *RaPower-3*, 343 F. Supp. 3d at 1188. Therefore, lens customers "were not allowed to claim a depreciation deduction for the full purchase price or any related amount." *Id.* at 1188–89.

In short, the district court concluded that customers were not allowed to claim the deductions or credits that Defendants advertised in connection with owning and leasing a lens.

### B. Existence of a Tax Shelter Under 26 U.S.C. § 6700

The district court construed § 6700(a)(2)(A) to permit the imposition of a penalty against any "person who 1) organizes or sells any plan or arrangement involving taxes and 2) makes or furnishes, or causes another to make or furnish, a statement connecting the allowability of a tax benefit with participating in the plan or arrangement, which statement the person knows or has reason to know is false or fraudulent as to any material matter." *Id*. at 1170. Penalties can also be recovered from one who sells a service or product at a grossly inflated price (more than twice the correct value, *see* 26 U.S.C. § 6700(b)(1)(A)), so that customers can claim excessive tax benefits. *See id.* § 6700(a)(2)(B); *United States v. Campbell*, 897 F.2d 1317, 1322 (5th Cir. 1990) (explaining that tax shelters based on gross overvaluations "eliminate the buyer's incentive to pay no more than the investment's value because the financing mechanism allows the buyer to save more in tax benefits than is paid for the investment. That economic incentive pushes the price above the value"); *see also Autrey v. United States*, 889 F.2d 973, 981 (11th Cir. 1989) ("[A] promoter is in essence strictly liable for grossly overstating the value of property or services based upon which an investor will attempt to take a deduction or credit.").

The district court determined that Defendants' "solar energy scheme [was] a 'plan' under § 6700 because the key component of the scheme was its promoted connection to

10

the federal tax benefits of a depreciation deduction and a solar energy tax credit."

*RaPower-3*, 343 F. Supp. 3d at 1170. And it found that all the Defendants "organized, or assisted in organizing the scheme, and sold the scheme to customers either directly or through other people." *Id.*

The district court further determined that Defendants made false or fraudulent statements about material matters by asserting that customers could claim deductions and credits in connection with their lens purchases. It explained that these statements were material because they "'would have a substantial impact on the decision-making process of a reasonably prudent investor and include matters relevant to the availability of a tax benefit.'" *Id.* at 1171 (quoting *Campbell*, 897 F.2d at1320).

And finally, the district court concluded that the scienter element of § 6700(a)(2)(A) was met because Defendants knew or had reason to know that their statements were false or fraudulent. It applied the following test:

> A court may conclude that a promoter had reason to know his statements are false or fraudulent based on what a reasonable person in the defendant's subjective position would have discovered. The trier of fact may impute knowledge to a promoter, so long as it is commensurate with the level of comprehension required by his role in the transaction. A person selling a plan would ordinarily be deemed to have knowledge of the facts revealed in the sales materials furnished to him by the promoter. A person who holds himself out as an authority on a tax topic has reason to know whether his statements about that topic are true or false. The test . . . is satisfied if the defendant had reason to know his statements were false or fraudulent, regardless of what he actually knew or believed.

*Id.* at 1173 (brackets, emphasis, citations, and internal quotation marks omitted). Under this test, Defendants knew all the facts indicating that lens customers were not entitled to claim the promoted deductions or credits. Further, their defense that they relied on the

advice of counsel that their customers were entitled to all of the promoted tax benefits was unavailing because "[i]f anything, the circumstances surrounding the writings [of the attorneys on whom they purportedly relied], and the attorneys' outraged response to learning that Defendants were using their writings to promote the solar energy scheme, bolster Defendants' reason to know that their statements were false or fraudulent." *Id.* at 1190.

The district court also concluded that Defendants had violated § 6700(a)(2)(B) by making gross overstatements as to the value of the lenses. It determined that each sheet of plastic from which lenses were to be cut cost Defendants between $52 and $70, and that "[b]ased on the available and credible evidence, . . . the correct valuation of any 'lens' is close to its raw cost, and does not exceed $100." *Id.* at 1191. Defendants were selling each lens for $3,500, so the court held that they "engaged in conduct subject to penalty under § 6700(a)(2)(B) and made or furnished a gross valuation overstatement each time they told someone the price of a lens[.]" *Id.*

### C. Injunctive and Equitable Relief

The district court ruled that injunctive and other equitable relief was appropriate under 26 U.S.C. § 7408 (which authorizes the government to seek injunctive relief to prevent ongoing conduct subject to penalty under § 6700 and other specified sections of the Tax Code) and § 7402(a) (which grants district courts jurisdiction to issue injunctions and other equitable relief to enforce the Tax Code), because Defendants had engaged in the scheme for many years; they knew that their statements about tax benefits were false or fraudulent; the scheme had caused great harm, including harm to the federal treasury;

12

and Mr. Johnson's and Mr. Shepard's lack of remorse and continuation of the scheme after the IRS began investigating their scheme indicated that they were very likely to continue promoting their abusive tax scheme unless enjoined from doing so. It issued an injunction to prohibit Defendants from continuing to engage in the conduct that was subject to penalty under § 6700. For the same reasons that an injunction was appropriate, the district court ordered Defendants to disgorge their gross receipts from lens sales.

Defendants appeal, raising a number of issues, to which we now turn.

## III. DISCUSSION

### A. Issues Addressed Summarily

Most of Defendants' arguments on appeal can be disposed of summarily. First, they complain that the due-process rights of Solco I and XSun Energy, entities that were "created, own[ed], and control[led]" by Mr. Johnson, *RaPower-3*, 343 F. Supp. 3d at 1127, were violated by an order of the district court to freeze their assets. But Defendants do not complain that their own rights were injured by the district court's order and have made no effort to explain how they have standing to assert the rights of those entities, even after the United States raised the issue of standing in its appellate brief. We therefore decline to address the issue.

Second, Defendants say that evidence obtained after trial necessitates a remand to the district court with instructions to dissolve the injunction. We understand this argument to be a challenge to the district court's denial of their motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). In that motion they asked for an amendment or alteration of the judgment in light of new evidence that their system

13

worked to produce electricity. The alleged new evidence was expert testimony that a system involving a commercially available engine had been used, in connection with the lenses at the Delta site, to produce electricity after the trial was conducted. The court denied the motion because "[t]he expert testimony that Defendants now seek to introduce was within their control to produce before and at trial." Order Denying Rule 59(e) and Rule 52(b) Mot., Dec. 4, 2018, ECF No. 529. Defendants do not challenge that statement or otherwise argue that there was anything preventing them from producing this evidence before or during trial. We therefore affirm the denial of their Rule 59(e) motion. *See Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1369 (10th Cir. 2015) ("[W]e affirm the district court's dismissal of the stigma-plus due-process claim because [Appellant]'s opening brief contains nary a word to challenge the basis of the dismissal[.]").

Third, Defendants contend that the district court improperly denied them a jury trial. They filed a jury demand two months after this lawsuit was filed. On the government's motion the magistrate judge assigned to the case struck Defendants' jury demand on May 2, 2016, on the ground that there was no Seventh Amendment right to a jury because the United States was seeking only equitable relief. The court later set the deadline for pretrial motions at November 17, 2017. On February 9, 2018, Defendants again moved for a jury trial, relying largely on the June 5, 2017, decision of the Supreme Court in *Kokesh v. S.E.C.*, 137 S. Ct. 1635. The district court denied Defendants' motion on two grounds: (1) on the merits, *Kokesh* did not support Defendants' jury demand; and (2) the renewed motion for a jury trial was untimely. On appeal Defendants challenge the first ground but not the second. Because they have not challenged the district court's

14

alternative ground for its ruling, we affirm. *See Starkey ex rel. A.B. v. Boulder Cty. Soc. Servs.*, 569 F.3d 1244, 1252 (10th Cir. 2009) ("When an appellant does not challenge a district court's alternate ground for its ruling, we may affirm the ruling."). Defendants' argument in their reply brief comes too late. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in a reply brief.").

Fourth, Defendants challenge the district court's determination that they knowingly engaged in a fraudulent tax scheme. In essence, they claim there is insufficient evidence to support the court's decision. But the challenge is wholly inadequate to preserve the issue for consideration. The case was tried over the course of 12 days. The district court's opinion, which occupies about 82 pages in the official reports, includes 427 findings of fact. The opening brief devotes a little less than 12 pages to the issue. It recites a smattering of evidence favorable to Defendants but wholly fails to deal with the voluminous contrary evidence. It does not identify a single finding of fact by the district court that is unsupported by evidence at trial. There is some discussion of the law, but that discussion does not grapple with the specific evidence presented in this case. In this circumstance, this court has no obligation to conduct what would amount to a de novo review of the trial evidence to see whether it supports the district court's rulings. *See Nixon*, 784 F.3d at 1366 ("[C]ounsel for appellant . . . tells a story of injustice and argues against positions not adopted by the district court. Counsel utterly fails, however, to explain what was wrong with the reasoning that the district court relied on in reaching its decision."); *United States v. Apperson*, 441 F.3d 1162, 1195

15

(10th Cir. 2006) ("[Appellant] purports to challenge the district court's ruling on all of the categories of evidence it prohibited him from using to cross-examine [a witness], but fails to offer any detailed explanation of how the district court erred. Accordingly, we conclude he has failed to sufficiently place these rulings at issue."); *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) ("[A] brief must contain an argument consisting of more than a generalized assertion of error, . . . Yet [appellant] offers no articulable basis for disturbing the district court's judgment.").

Moreover, the record on appeal would not permit us to conduct such a factual review. The record includes some exhibits offered at trial but only a fraction of the testimony (and that fraction appears in the appellee's appendix, not the appellant's appendix). Under Fed. R. App. P. 10(b)(2), "[i]f the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion." As we have explained: "Our appellate review is necessarily limited when . . . an appellant challenges the sufficiency of the evidence and rulings of the district court but fails to include in the record a transcript of all evidence relevant to such finding or conclusion." *Deines v. Vermeer Mfg. Co.*, 969 F.2d 977, 979 (10th Cir. 1992) (internal quotation marks omitted); *see United States v. Brody*, 705 F.3d 1277, 1280 (10th Cir. 2013) ("By failing to file a copy of the trial transcript as part of the record on appeal, the appellant waives any claims concerning the sufficiency of the evidence at trial." (internal quotation marks omitted)).

## B. Disgorgement Order

Defendants challenge the district court's disgorgement awards. "[D]isgorgement is a form of 'restitution measured by the defendant's wrongful gain.'" *Kokesh*, 137 S. Ct. at 1640 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt. a, p. 204 (Am. Law Inst. 2010) (original brackets omitted) (hereafter, the Restatement)). It "is by nature an equitable remedy as to which a trial court is vested with broad discretionary powers." *S.E.C. v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006) (internal quotation marks omitted).

The district court held Defendants jointly and severally liable for disgorgement of $50,025,480, with the maximum for each Defendant set at the amount of gross receipts received by that Defendant from the solar-energy scheme; Johnson was liable for the full amount, RaPower's limit was set at $25,874,066, IAS's limit was $5,438,089, and Shepard's was $702,001. The court did not deduct operating expenses of the companies, quoting the Restatement § 51(5)(c) for the proposition that a defendant "will not be allowed any credit of operating expenses to 'carry[ ] on the business that is the source of the profit subject to disgorgement.'" *RaPower-3*, 343 F. Supp. 3d at 1196 & n.633.[1]

---

[1] The Restatement provision states:

> A conscious wrongdoer or a defaulting fiduciary may be allowed a credit for money expended in acquiring or preserving the property or in carrying on the business that is the source of the profit subject to disgorgement. By contrast, such a defendant will ordinarily be denied any credit for contributions in the form of services, or for expenditures incurred directly in the commission of a wrong to the claimant.

17

We review for clear error the computation of the disgorgement amount and we review de novo the method for determining that amount. *See Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1162 (10th Cir. 2013) (disgorgement award under the Lanham Act). Defendants raise several arguments against the awards.

First, they contend that they did not intentionally defraud investors because they "encouraged . . . customers to seek their own tax advice." Aplt. Br. at 26. But, as with their challenge to the ruling that they had engaged in a fraudulent scheme, their argument is inadequate. They do not specifically challenge any relevant findings of the district court, address the evidence relied on by the court, or even include in the record the testimony and other evidence that would enable us to make an independent judgment of the sufficiency of the evidence.

Defendants also complain about the district court's finding that they had damaged the United States Treasury in the amount of $14,207,517 through tax benefits claimed by lens customers between 2013 and 2016. But it does not appear that the district court used that figure in computing disgorgement amounts.

Another complaint by Defendants is that the awards permit double recovery against them. But there can be no double recovery. Although Defendants are jointly liable for certain amounts, the government cannot collect the sum of the separate awards against them. To the extent that two of them are jointly and severally liable for the same amount, the government can collect from either, but not both. For example, if RaPower

---

Restatement 3d, § 51(5)(c).

18

paid the full $25,874,066 it owes, that amount would be subtracted from Johnson's liability.

Defendants' principal complaint is the amount of the disgorgement awards. We have stated that the plaintiff has the burden of showing gross receipts, while the defendant has the burden of proving any claimed deduction. *See Klein-Becker*, 711 F.3d at 1163. The Restatement § 51 cmt. i observes that "the precise amount of the defendant's unjust enrichment may be difficult or impossible to ascertain." But "a claimant who is prepared to show a causal connection between defendant's wrongdoing and a measurable increase in the defendant's net assets will satisfy the burden of proof as ordinarily understood." *Id.* "[P]laintiffs must generally establish damages with specificity," although "some estimation is acceptable if necessitated in part by the [d]efendant's poor record keeping." *Klein-Becker*, 711 F.3d at 1163 (original brackets and internal quotation marks omitted). Any uncertainty is resolved against the "conscious wrongdoer," in keeping with the rule that "'when damages are at some unascertainable amount below an upper limit and when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount.'" Restatement § 51 cmt. i (quoting *Gratz v. Claughton*, 187 F.2d 46, 51–52 (2d Cir. 1951) (L. Hand, J.)).

Defendants argue that the district court should have subtracted operating expenses from the gross receipts to determine the amount that should be disgorged. But they acknowledge that "a defendant is not allowed to deduct business expenses from the disgorgement amount if the business was created and run to 'defraud investors.'" Aplt.

19

Br. at 25. They simply assert that "Plaintiff did not show Defendants intentionally defrauded investors." *Id*. But they do not muster an adequate challenge to the sufficiency of the evidence on that score.

Defendants further complain that the government at various times suggested a wide range of possible damages. But they fail to explain how the government's earlier suggestions could have improperly influenced the court's award.

Finally, Defendants challenge the way the district court computed the gross receipts from their enterprises. The court relied on Defendants' customer database, which apparently included transactions almost up to the time of trial, and showed that they sold 49,415 lenses and customers paid in $50,025,480 through February 28, 2018. This was less than what would have come in if customers had made only the down payment on each lens. The down payment from customers was to be $9,000 from 2006 through 2009 and $1,050 after 2009. Multiplying the lower down payment of $1,050 by the number of lenses sold gives a figure of $51,885,750. The court said that its award was also supported by the government's bank-deposit analysis for deposits through 2016.

Defendants argue that the customer database was misinterpreted, leading to an excessively high figure. But it was their database and they would know better than anyone how to interpret the data; yet they offered no testimony regarding the database. Nor have they pointed to any errors by the court that appear on the face of the database. For example, their reply brief states that the database "contains entries listing a small down payment, some entries show a partial down payment, some of those payments bounced (but could not be deleted from the database), some orders were canceled (but

20

could not be deleted), and some amounts are refunded (but cannot be deleted) and all contracts offered a full refund." Aplt. Rep. Br. at 7. The brief, however, does not identify any specific entries supporting their assertion, nor do they identify any evidence in the record supporting the claim that certain entries could not be deleted from the database. This failure to support their arguments with evidence is not just a lapse on appeal; they failed at trial as well. As the district court said, "Defendants—who are the ones in possession of the best evidence of a reasonable approximation of their gross receipts—failed to rebut the United States' evidence of this reasonable approximation, and introduced no credible evidence of their own on the point." *RaPower-3*, 343 F. Supp. 3d at 1195. Similarly, although it is not clear to us from the limited appellate record whether the district court's gross-receipts estimate is well-supported by the bank-deposit evidence (the record contains document summaries but no testimony explaining them), the failure of Defendants to include the bank-deposit testimony in the appellate record makes it impossible for us to evaluate the bank-deposit evidence; and, in any event, Defendants, as with so many other issues, do not adequately argue the matter in their briefs.

In our view, the district court's computation was not clearly erroneous because it was a reasonable approximation. It used Defendants' own business records to determine how many lenses were sold, and multiplied that by a conservative estimate of the amount paid for each lens. Defendants argue about ambiguities in their own records that led the court to calculate an excessively high gross-receipts figure; but they bore the risk of uncertainty, particularly when caused by their own record keeping, obstruction of

21

discovery (further discussed below), and decision not to put on any evidence or call any witnesses who could have helped the court reach a more precise estimate of their receipts or any legitimate expenses.

We affirm the disgorgement awards against Defendants.

### C. Alleged Discovery Violations

### 1. Computation of Damages

Defendants challenge the district court's admission of evidence that supported the amount of disgorgement, contending that the evidence had not been adequately disclosed before trial. Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires each party to "provide to the other parties . . . a computation of each category of damages claimed by the disclosing party." Moreover, the claimant has an ongoing duty throughout the litigation to supplement the damages computation "in a timely manner [(1)] if the party learns that in some material respect the [initial] disclosure or response is incomplete or incorrect, and [(2)] if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]" Fed. R. Civ. P. 26(e)(1)(A). If a party fails to disclose or, where appropriate, supplement computations, Federal Rule of Civil Procedure Rule 37(c)(1) prohibits the use of that "information or witness to supply evidence . . . unless the failure was substantially justified or is harmless."

The district court denied Defendants' motion in limine to exclude evidence and testimony relating to disgorgement, ruling that "'[d]isgorgement is not a damages remedy, and therefore 'the disclosure required by Rule 26(a)(1)(A)(iii) is inapplicable.'"

22

Aplt. App., Vol. I at 115 (quoting *United States v. Stinson*, 2016 WL 8488241, at *7 (M.D. Fla. 2016)). We are not so sure that disgorgement does not come within the meaning of *damages* in the rule. The advisory committee note to the 1993 amendments to Rule 26 (addressing 26(a)(1)(C), which became 26(a)(1)(A)(iii) in the 2007 amendment restyling the Rule) says: "A party claiming damages *or other monetary relief* must, in addition to disclosing the calculation of such damages, make available the supporting documents for inspection and copying . . . ." Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment (emphasis added). It therefore appears to require disclosure of calculations for equitable remedies providing monetary relief. On the other hand, the last sentence of that paragraph in the 1993 note states: "Likewise, a party would not be expected to provide a calculation of damages which, as in many patent infringement actions, depends on information in the possession of another party or person." *Id.* As with disgorgement here, the recovery sought in a patent-infringement action may be based on the defendant's income (rather than the injury to the plaintiff); so the sentence certainly supports the district court's decision, although on a slightly different ground—the fact that the information necessary to calculate the monetary relief is in the hands of the defendant.

In any event, even if the rule applied to the government here, it was satisfied. The evidence necessary to determine Defendants' gross receipts for the purpose of assessing disgorgement was in the hands of Defendants. The government was reasonably forthcoming once it obtained that evidence. The government's initial disclosure in April 2016 said that it would seek "disgorgement of the . . . gross receipts . . . [Defendants]

23

received from any source as a result of their conduct in furtherance of the abusive solar energy scheme[.]" United States' Initial Disclosures to All Defs., Ex. 1 to Defs.' Reply Mem. in Supp. of Mot. in Lim. to Exclude Test. Regarding Damages Relating to Disgorgement of Funds at 7, Mar. 13, 2018, ECF No. 337-1. It further stated that the information then in its possession showed that Defendant Shepard earned $170,000 from the scheme over the course of four years and that Defendant Johnson had earned nearly $500,000 over the course of two years. And it added that the government "expect[ed] the disgorgement calculation to increase as additional information is produced with respect to the gross receipts each defendant received relating to the abusive tax scheme." *Id.* at 8.

To make a more complete assessment of what disgorgement damages it would seek, the government needed to review Defendants' records that would show how many lenses had been purchased and how much money they had taken in. But despite discovery requests for those records in April 2016 and a motion to compel filed in August 2017, Defendants were not forthcoming. Finally, on October 16, 2017, Defendants provided 190 pages of customer information. With that information, the government disclosed about five months before trial a disgorgement figure in the same ballpark as the ultimate award. On November 17, 2017, it moved for an order to freeze Defendants' assets and appoint a receiver "to ensure that Defendants will have the funds to pay any disgorgement this Court may award." United States' Mot. to Freeze the Assets of Defs. Neldon Johnson, RaPower-3, LLC, and International Automated Systems, Inc. and Appoint a Receiver at 5, Nov. 17, 2017, ECF No. 252. Its supporting memorandum argued that the amount frozen should equal the number of lenses sold by Defendants

24

multiplied by the $1,050 down payment for each lens. It reported that, "[a]ccording to Defendants' own records (which are likely incomplete), Defendants have sold *at least* 45,201 lenses," so that $47,461,050 should be frozen. *Id.* at 13.

The October disclosure by Defendants, however, was still incomplete. In January, the district court, no longer willing to rely on voluntary compliance by Defendants, ordered Defendants to allow the government's computer forensic expert to make a copy of the customer database from their computer equipment. The government finally obtained the raw data on February 28. It therefore took some chutzpah for Defendants to file on March 5 a motion in limine to exclude testimony regarding disgorgement damages on the ground that the government had not disclosed its calculations in a timely manner.

Once the context is understood, any complaint that the government violated Rule 26 by failing to timely produce its disgorgement calculations is plainly without merit. Because the government was required only to supplement its initial Rule 26(a)(1)(A)(iii) disgorgement computation "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," because the information was largely "made known" to Defendants in the government's motion to freeze their assets, and because the complete evidence of Defendants' gross receipts was not obtained by the government until shortly before the motion in limine was filed, it was not an abuse of discretion for the district court to admit the government's evidence of Defendants' gross receipts.

25

## 2. Expert Witnesses

Federal Rule of Civil Procedure 26(a)(2) requires a party to disclose witnesses who may give expert testimony and, in certain circumstances, provide a report by the expert. Defendants argue that various testimony by government witnesses should not have been admitted because the government had failed to disclose the witnesses as experts before they testified. The challenged testimony related to the amount of deposits into Defendants' bank accounts, the amount of gross receipts based on lens sales multiplied by down payments, and the estimated harm to the Treasury based on tax benefits claimed multiplied by an assumed tax rate. The district court determined that the government's witnesses were not offering expert testimony, so the government was not required to identify them as experts or produce expert-witness reports. The district court was correct.

It is not an abuse of discretion to allow a nonexpert witness to testify regarding "elementary mathematical operations." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011); *see Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("Taking a simple average of 103 numbers, though technically a statistical determination, is not so complex a task that litigants need to hire experts in order to deem the evidence trustworthy"). Defendants have waived their challenge by not including in the record on appeal the testimony they ask us to review. *See Deines*, 969 F.2d at 979. But in any event, the testimony that we do have for review did not require expert credentials. For example, the government witness who testified regarding the harm to the United States Treasury simply multiplied the IRS's publicly available

26

average tax rate by the sum of the deduction and credit amounts claimed by a sample of RaPower customers. Because these "mathematical calculation[s] [were] well within the ability of anyone with a grade-school education," *Bryant*, 432 F.3d at 1124, it was not an abuse of discretion to admit their testimony.

## IV.    CONCLUSION

We **AFFIRM** the judgment below.