**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 30, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

BEUS GILBERT PLLC,

      Plaintiff,

v.

DONALD L. ROBERTSON TRUST,

      Defendant Crossclaimant -
      Appellant,

v.

BRIGHAM YOUNG UNIVERSITY,

      Defendant Crossclaim
      Defendant - Appellee.

No. 20-4061
(D.C. Nos. 2:12-CV-00970-RJS &
2:14-CV-00206-RJS)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **EBEL** and **BACHARACH**, Circuit
Judges.
_____

This case arises out of the discovery of the COX-2 enzyme. The

discovery proved lucrative, leading three biochemists to claim partial

credit. Among them was Dr. Donald L. Robertson, who allegedly helped

---

[*]    This order and judgment does not constitute binding precedent except
under the doctrines of law of the case, res judicata, and collateral estoppel.
But the order and judgment may be cited for its persuasive value if
otherwise appropriate. Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

discover the enzyme while working as a biochemistry professor at Brigham Young University. The discovery was shared with a major pharmaceutical company, which used the information to develop a blockbuster drug called "Celebrex." BYU sued the pharmaceutical company and settled in 2012 for $450 million.

After paying attorney's fees, BYU kept 55% for itself and agreed to distribute the other 45% to the biochemists responsible for the discovery. Dr. Robertson and the two other biochemists disagreed on the allocation, and litigation ensued.

During the litigation, Dr. Robertson died. His successor in interest, the Donald L. Robertson Trust, moved for leave to file amended crossclaims against BYU for breach of contract and misappropriation of trade secrets. The district court denied the motion, and the Trust appeals.

In deciding this appeal, we conclude that the Trust's allegations

- state a valid claim for breach of contract and

- show that the limitations period had already expired for a claim of misappropriation of trade secrets.

Given these conclusions, we partially affirm and partially reverse the denial of leave to amend.

## I.    The Denial of Leave to Amend

The Trust challenges the denial of leave to amend the crossclaims to add claims for breach of contract and misappropriation of trade secrets.

The district court denied the motion as futile, concluding that the amended claims would not survive a motion to dismiss.

## A.    The Standard of Review for Futility

When reviewing a denial of leave to amend, we ordinarily apply the abuse-of-discretion standard. *Johnson v. Spencer*, 950 F.3d 680, 720–21 (10th Cir. 2020). But when a district court disallows amendments based on futility, we conduct de novo review. *Id.* Here the district court concluded that the amendments were futile because they would not survive a motion to dismiss for failure to state a valid claim. So our review is de novo.

Dismissal for failure to state a claim is proper only if the allegations lack enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).

In determining facial plausibility, "we will disregard conclusory statements and look only to . . . the remaining[] factual allegations . . . ." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). But "specific facts" are unnecessary; the claimant needs only to provide "fair notice" of the claim and its grounds. *Id.* at 1192. We credit the "well-pled factual allegations," viewing them "in the light most favorable" to the claimant and in "the context of the entire [crossclaim.]" *Evans v. Diamond*,

3

957 F.3d 1098, 1100 (10th Cir. 2020) (quoting *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010)); *Ullery v. Bradley*, 949 F.3d 1282, 1288 (10th Cir. 2020).

**B.    The Proposed Addition of a Crossclaim for Breach of Contract**

For substantive legal principles on the proposed amendment to the crossclaim for breach of contract, we apply Utah law. *Corneveaux v. CUNA Mut. Ins. Grp.*, 76 F.3d 1498, 1506 (10th Cir. 1996). Under Utah law, a contract claim requires four elements:

1.    the existence of a contract,

2.    the performance by the party seeking recovery,

3.    a breach by the other party, and

4.    the existence of damages.

*Am. W. Bank Members, L.C. v. State*, 342 P.3d 224, 230–31 (Utah 2014). The district court denied the adequacy of allegations on the first two elements: a contract and Dr. Robertson's performance.[1] We disagree with the district court.

---

[1]    BYU does not question satisfaction of the last two elements (a contractual breach and the existence of damages).

**1.      The Trust plausibly alleged a contract and Dr. Robertson's performance.**

In our view, the Trust's amended crossclaim for breach of contract satisfied the first two elements by alleging a contract and Dr. Robertson's performance.

**a.      The Trust plausibly alleged a contract between Dr. Robertson and BYU based on the IP Policies in effect from 1989 to 1992 and adopted in 1992.**

For a contract claim, the Trust must allege a contract between Dr. Robertson and BYU. The district court regarded the allegations as deficient for failing to say

- what the material terms were or

- when and how a contract had been formed.

We disagree because the Trust plausibly alleged that Dr. Robertson and BYU had entered into implied contracts governed by the IP Policies

- in effect from 1989 to 1992 and

- adopted in 1992.[2]

---

[2]      The complaint refers to "the BYU IP Policy that was in effect from 1989 through 1992 during the development of COX-2." *See, e.g.*, Appellant's App'x vol. 2, at 78–79, ¶¶ 27, 38. The Trust has explained in district court and on appeal that this reference encompasses the IP Policy adopted in 1992. *Id.* at 199, 201, 207–210, 225, 229–33; Appellant's Opening Br. at 24, 34; Appellant's Reply Br. at 2, 8.

### i. A contract may be implied.

"An implied contract may arise from . . . personnel policies . . . ." *Cabaness v. Thomas*, 232 P.3d 486, 502 (Utah 2010), *abrogated on other grounds by Gregory & Swapp, PLLC v. Kranendonk*, 424 P.3d 897 (Utah 2018). Personnel policies create an implied contract if

- the employer communicates a "promise of employment under certain terms" to the employee and

- the employee performs under the offer.

*Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1001–02 (Utah 1991).

### ii. The alleged facts establish an implied contract under the IP Policy in effect between 1989 and 1992.

The Trust plausibly alleged an implied contract under the IP Policy in effect from 1989 to 1992 by stating the material terms.

The Trust paraphrased the terms but did not attach the IP Policy in effect before the adoption of the 1992 policy. Attaching the policy was unnecessary; the Trust needed only to plead the key promises. *See T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 841–42 (4th Cir. 2004) (concluding that a plaintiff had adequately pleaded a breach of contract without attaching written documentation by pleading that a defendant had "retained" the plaintiff to work on a real estate purchase and had agreed to pay "a customary real estate commission for [the plaintiff's] services"); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("A plaintiff is under no

6

obligation to attach to her complaint documents upon which her action is based . . . ."); *see also* 5A Arthur R. Miller, Mary Kay Kane & A. Benjamin Spencer, *Federal Practice and Procedure* § 1327 (4th ed. Oct. 2020 update) ("The provision for incorporation of exhibits in Rule 10(c) is permissive only, and there is no requirement that the pleader attach a copy of the writing on which his claim for relief or defense is based.").

The Trust satisfied this requirement by pleading the key promises of the IP Policy:

> 10.    The development of COX-2 occurred on BYU's campus between 1989 and 1992.
>
> 11.    At all times during their employment, in particular during the development of COX-2, BYU's employment agreements with Dr. Robertson, Dr. Simmons, and Dr. Xie included the provisions of BYU Intellectual Property Policy as it existed at that time.
>
> * * * *
>
> 13.    Under the IP Policy that was effective from 1989 through 1992 during the development of COX-2, BYU claimed ownership of the COX-2 technology as the property of BYU.
>
> 14.    Under the IP Policy that was effective from 1989 through 1992 during the development of COX-2, BYU has a duty to distribute income to the individuals from whom BYU has claimed ownership of the COX-2 technology.

Appellant's App'x vol. 2, at 76.

7

The district court concluded that the Trust had needed to allege more specific facts. We disagree. The Trust's factual allegations imply two key promises:

1. Dr. Robertson promised to work at BYU (*Id.* ¶ 11) and to relinquish ownership of any discoveries like COX-2 (*Id.* ¶¶ 11, 13).

2. BYU promised to employ Dr. Robertson (*Id.* ¶ 11), to support his research (*Id.* ¶¶ 10–11), and to distribute income to employees making discoveries (like COX-2) subject to BYU's ownership (*Id.* ¶¶ 11, 14).

The Trust also adequately alleged the formation of an implied contract based on these terms because

- BYU had communicated the IP Policy to Dr. Robertson and

- he had accepted the offer by continuing performance.

The Trust alleged communication of the IP Policy in two ways.

First, the Trust alleged that

- the IP Policy in existence "at the time" had been "included" in the "employment agreement" with BYU (*Id.* at 76 ¶ 12) and

- the IP Policy made key promises. (*See* p. 7, above.)

These allegations reasonably imply that BYU communicated the terms as a binding promise to Dr. Robertson: if Dr. Robertson didn't know the terms of his employment agreement, how could he have been expected to comply? *See Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1001 (Utah 1991) ("[I]f an employee manual is to be considered part of an employment contract, the terms should be considered terms of a unilateral contract.").

8

Second, the Trust attached correspondence from Dr. Robertson, stating his belief that "[t]he acknowledgment of the participants in this [COX-2] discovery [was] consistent with research policies which [were] firmly established at both universities and in industry for the acknowledgment of contributions to any discovery." Appellant's App'x, vol. 2 at 136. Dr. Robertson's reference to the "firmly established" IP Policy suggests that BYU had communicated the IP Policy to him by 1989.

The Trust also alleged that Dr. Robertson had accepted the implied contract by staying at BYU and "faithfully performing all that was required of him under his employment agreement" between 1989 and 1992. *Id.* at 75 ¶ 7, 76 ¶¶ 15, 16. So the Trust adequately alleged an implied contract governed by the IP Policy in effect between 1989 and 1992.

In reaching a contrary result, the district court cited three district court opinions with more specific facts. One opinion followed a bench trial, a second opinion decided a summary-judgment motion, and a third opinion recognized only that the plaintiff had adequately alleged a valid claim. *See Fenn v. Yale Univ.*, 283 F. Supp. 2d 615, 620 (D. Conn. 2003) (opinion after a bench trial); *Univ. of W. Va. Bd. of Trs. v. VanVoorhies*, 84 F. Supp. 2d 759, 771 (N.D. W. Va. 2000) (opinion denying summary judgment); *Charest v. President & Fellows of Harvard Coll.*, 2016 WL 614368, at *11–12 (D. Mass. Feb. 16, 2016) (opinion denying in part a motion to dismiss). None of these opinions suggested a baseline for

9

specificity in a complaint or crossclaim. At this stage, the allegations need only to support a "reasonable inference" of a contract and its terms. *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). So the three cited opinions shed little light on the adequacy of the Trust's allegations.

### iii. The alleged facts establish an implied contract under the IP Policy adopted in 1992.

The Trust also plausibly alleged an implied contract based on the IP Policy adopted in 1992.

First, the Trust alleged the terms of the 1992 IP Policy by attaching a copy. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

Second, the Trust alleged that the terms had become effective as an implied contract: BYU had communicated the terms through a binding promise to Dr. Robertson, and Dr. Robertson accepted the terms by remaining at BYU until 1995.

The Trust adequately alleged communication of the terms as a binding promise because the 1992 IP Policy had expressly required faculty compliance. *See* p. 8, above. For example, the 1992 IP Policy stated: "Intellectual property . . . developed by University personnel within their field of expertise and/or scope of employment at the University . . . [is] the property of the University." Appellant's App'x vol. 2, at 86. The 1992 IP Policy also stated that it applied to all faculty, implying that

10

- BYU was publishing the policy to all faculty (including Dr. Robertson),

- all faculty had been aware of the policy, and

- all faculty had regarded the policy as a binding promise.

The Trust also adequately alleged that Dr. Robertson had accepted the implied contract by staying at BYU after the publication of the 1992 IP Policy. *See* p. 9, above. So the Trust adequately alleged an implied contract based on the IP Policy adopted in 1992.

**iv.    The Trust did not plausibly allege Dr. Robertson's entry into a contract under the 2001 IP Policy.**

The Trust also claimed, in the alternative, that BYU had breached a contract governed by the 2001 IP Policy.[3] The district court properly rejected this claim. By the time that BYU had adopted this policy, Dr. Robertson had left; and there's nothing in the allegations to support a contract between BYU and a former professor.

The Trust makes three arguments for a contract under the 2001 IP Policy:

1.    BYU and two other biochemists pleaded the creation of a contract based on the 2001 IP Policy.

2.    BYU admitted that the 2001 IP Policy had created a contract when moving for a stay.

---

[3]    The Trust also alleged a contract based on the IP Policy adopted in 2000; but on appeal, the Trust treats this policy as identical to the 2001 policy.

11

3.     The district court implicitly recognized the contractual nature of the 2001 IP Policy by using it to stay the litigation on other biochemists' claims.

These arguments are not persuasive.[4]

First, the Trust argues that BYU and two other biochemists admitted the binding nature of the 2001 IP Policy. For example, BYU pleaded that the 2001 IP Policy should determine the parties' rights. Appellant's App'x vol. 1, at 151–54, ¶¶ 19–21, 28, 31, 35 (BYU's crossclaim). But Dr. Robertson denied the binding nature of the 2001 IP Policy and its procedures. Appellee's Supp'l App'x vol. 1, at 57–59 ¶¶ 19–21, 28, 31, 35 (Dr. Robertson's response to BYU's crossclaim). So the Trust can't rely on BYU's invocation of the 2001 IP Policy. Nor can the Trust rely on the pleadings of other biochemists, for their relationships with BYU don't affect the terms reached with Dr. Robertson.

Second, the Trust argues that BYU admitted the binding nature of the 2001 IP Policy by moving for a stay. But BYU sought a stay only in the alternative, arguing that if the district court were to allow amendment, the terms of the 2001 IP Policy would require a stay for alternative dispute resolution. By seeking a stay in the alternative, BYU did not concede a contract with Dr. Robertson.

---

[4]     The Trust also briefly argues that the 2001 IP Policy applies because it was in effect when BYU received the settlement funds. But the Trust does not explain the relevance of this timing or say how Dr. Robertson could have performed under a contract formed after he had left BYU.

12

Third, the Trust contends that the district court based a separate stay order on the 2001 IP Policy. But the stay order did not implicitly characterize the 2001 IP policy as a contract: the two other biochemists did not oppose the stay, and BYU relied in part on a desire to mediate.

So the Trust did not plausibly allege a contract governed by the 2001 IP Policy.

\* \* \*

The Trust plausibly alleged that Dr. Robertson and BYU had entered into implied contracts governed only by the IP Policies

- in effect between 1989 and 1992 and

- adopted in 1992.

**b.** **The Trust plausibly alleged Dr. Robertson's performance under the implied contracts.**

Dr. Robertson's performance constitutes an element of the contract claim, so the Trust needed to plead his performance. The Trust did so in part by generally alleging that Dr. Robertson had "faithfully performed all that was required of him under his employment agreement with BYU, including the BYU IP Policy that was effective from 1989 through 1992 during the development of COX-2." Appellant's App'x vol. 2, at 76 ¶ 15. The Trust elaborated with three specific factual allegations:

1. "Dr. Robertson [had begun] teaching as a professor of biochemistry at BYU in 1980" and had "left BYU in 1995." *Id.* at 75–76 ¶¶ 7, 16.

2. "Dr. Robertson [had] stated 'the discovery of COX-2 was actually between Dr. Simmons, Dr. Xie, and myself.'" *Id.* at 78 ¶ 24 (quoting *id.* at 134).

3. "Dr. Robertson [had] advised BYU in 2013 and 2014 that he was a developer of the COX-2 technology." *Id.* at 78 ¶¶ 24–25.

These factual allegations incorporated a letter from Dr. Robertson, where he explained his contributions to the discovery of COX-2 and gave details about his experiments and support for another biochemist's work. *Id.* at 133–35; *see also id.* at 78 ¶ 24 (referring to the exhibit with this explanation). Similarly, the Trust alleged that BYU had received other correspondence showing Dr. Robertson's contributions to the discovery of the enzyme, including his supervision of relevant research, his provision of cell lines, the use of his laboratory and equipment, and his role as a principal investigator in the research leading to discovery of COX-2. *Id.* at 138–39; *see also id.* at 78 ¶ 25 (referring to the exhibit with this explanation).

The district court considered the allegations inadequate for two reasons:

1. The Trust had not alleged the terms of the agreement.

2. The Trust had not alleged the actions taken by Dr. Robertson "to comport with those terms."

*Id.* at 273. We disagree.

14

First, the district court ruled that with no more factual allegations about the contractual terms, "the Trust's conclusory allegation that Robertson [had done] 'all he was required to do' [fell] short of plausibly pleading contract performance." *Id.* But the Trust did adequately plead the contractual terms. *See* Part I(B)(1)(a)(i)–(iii), above.

Second, the district court concluded that the Trust had not alleged satisfaction of Dr. Robertson's contractual obligations. In arriving at this conclusion, the district court reasoned that the Trust hadn't framed its allegations about Dr. Robertson's work as "conduct undertaken to fulfill his performance obligations under any contract." Appellant's App'x vol. 2, at 273.

We disagree, for we view allegations "in the light most favorable" to the claimant and in "the context of the entire [crossclaim.]" *Evans v. Diamond*, 957 F.3d 1098, 1100 (10th Cir. 2020) (quoting *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010)); *Ullery v. Bradley*, 949 F.3d 1282, 1288 (10th Cir. 2020); *see* pp. 3–4, above. The Trust incorporated the specific allegations into the breach-of-contract claim, Appellant's App'x vol. 2, at 78 ¶ 26, and cited these allegations on the element of performance. Appellee's App'x vol. 1, at 235. Nothing more was necessary.

15

BYU defends this ruling, arguing that the Trust failed to allege Dr. Robertson's disclosure of his contributions to BYU and entry into a distribution agreement.[5] This argument fails legally and factually.

The argument fails legally because a claimant need not specifically allege satisfaction of every contractual obligation. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (stating that specific factual allegations are unnecessary in the complaint). The Trust generally alleged Dr. Robertson's performance and specifically alleged how he had contributed to the discovery of the enzyme. *See* Part I(B)(1)(b), above. These allegations suffice.

The argument also fails factually because the Trust alleged that BYU had considered and rejected Dr. Robertson's status as a potential developer.[6] BYU argues that his disclosure was too late to patent discovery of the enzyme. Appellee's Resp. Br. at 39–40. But BYU does not

---

[5]    Relying on evidence outside the pleadings, BYU also argues that Dr. Robertson did not actually disclose his role as developer. But that's an issue for summary judgment, and the district court did not convert this motion into one for summary judgment. *See* Appellant's App'x vol. 2, at 274 n.85 (excluding consideration of material outside the pleadings because no party had moved for conversion of the motion to one for summary judgment).

[6]    BYU also makes two other arguments, one about the IP Policy adopted in 2001 and another about the IP Policy in effect from 1989 to 1992.

- support this argument with citations to the IP Policy adopted in 1992 or

- suggest that it would have claimed a patent for the enzyme if Dr. Robertson had disclosed his role earlier.

## 2. The Trust's allegations go beyond those of the claimants in BYU's cited authorities.

Finally, BYU argues broadly that the Trust's allegations don't adequately state a contract claim. But BYU's cited authorities do not apply. For example, BYU cites *Cai v. Huntsman Corp.*, 810 F. App'x 639, 643 (10th Cir. 2020) (unpublished). But in *Cai*, the plaintiff never claimed to be an employee. *See id.* Here, the Trust alleged that BYU had employed Dr. Robertson.

BYU's other cited authorities are non-binding opinions where the claimant didn't allege the content of any contractual provisions or identify

---

First, BYU argues that this duty of disclosure is imposed by the IP Policy adopted in 2001. But we have elsewhere rejected the Trust's reliance on this policy. *See* pp. 11–13, above.

Second, BYU argues that the Trust couldn't deny an obligation for express disclosure under the IP Policy in effect from 1989 to 1992: "Notably, the Trust does not allege that any of the policies it argues could theoretically apply impose anything less than express disclosure obligations on a would-be developer." Appellee's Resp. Br. at 37–38. For this argument, BYU supplies no explanation or support.

The Trust could allege that the IP Policy in effect from 1989 to 1992 had not expressly required disclosure of inventions bearing commercial potential. After all, BYU has not pointed to anything in the 1989–1992 IP Policy requiring such a disclosure.

a provision that had been breached. *See Estate of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020) (stating that the plaintiff did not allege "any general or specific provision of any contract that [defendant] might have breached"); *Bissessur v. Ind. Univ. Bd. of Trs.,* 581 F.3d 599, 603–04 (7th Cir. 2009) (stating that the pleading "contain[ed] no facts concerning: (1) what, if any, promises the University made to [the plaintiff]; (2) how these promises were communicated; (3) what [the plaintiff] promised in return; or (4) how these promises created an implied contract"); *Guajardo v. JP Morgan Chase Bank*, N.A., 605 F. App'x 240, 244 (5th Cir. 2015) (unpublished) (stating that the "[p]laintiffs failed to allege the manner in which" the defendant had breached the contract or identify a contractual provision that had been breached); *Northampton Rest. Grp., Inc. v. FirstMerit Bank*, N.A., 492 F. App'x 518, 522 (6th Cir. 2012) (unpublished) (concluding that "without the contracts or reference to specific language, [the plaintiff] ha[d] failed to put forth a plausible claim for relief"); *Cotter v. Newark Hous. Auth.*, 422 F. App'x 95, 99 (3d Cir. 2011) (unpublished) (stating that the pleadings had alleged no offer and acceptance because "the offer [had been] rejected in favor of a counter-offer"). These opinions don't apply because the Trust did allege how BYU had breached the contracts.

## C. The Proposed Addition of a Crossclaim for Misappropriation of Trade Secrets

The Trust also sought leave to add a crossclaim for misappropriation of trade secrets. The district court concluded that this claim had been time-barred, and we agree. The district court reasoned that the Trust had waited to assert this claim until roughly seven months after the limitations period. The Trust doesn't question that the limitations period had ended for a new claim;[7] the Trust instead argues that the proposed crossclaim would relate back to the filing date of the original crossclaims.

But the Trust didn't make this argument in district court. There counsel for the Trust said only: "So if there's a triggering event . . . that's well within three years from *when he first brought his cross-claims in this case.*" *Id.* at 228–29 (emphasis added). The Trust didn't mention the term "relation back" or present a related argument. Indeed, the district court observed that it was not addressing possible "relation back" because the Trust had "not raise[d] or offer[ed] argument on the issue of whether the trade secret claim relates back to the filing of [Dr.] Robertson's original Cross Claim under Rule 15(c)." *Id.* at 281 n.117.

By failing to raise the issue in district court, the Trust forfeited the issue. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir.

---

[7] The Trust does argue that the limitations period started in June 2012 rather than in May 2012. But this difference in timing would not affect the timeliness of this claim.

2011). We could ordinarily consider the issue under the plain-error standard. *Id.* But the Trust has not urged plain error, so we will not consider the argument. *Id.* at 1131. We thus affirm the denial of leave to add a crossclaim for misappropriation of trade secrets.

## II. The Discovery Motion

The Trust also moved for discovery of two items:

1. the version of the BYU Intellectual Property Policy provided to Dr. Robertson in 1980 with his appointment letter and

2. the version of the BYU Intellectual Property Policy in effect from 1989 to 1992.

The district court denied the motion, and BYU defends the ruling because the Trust had no pending claim when the court disallowed discovery.

As BYU suggests, discovery would ordinarily be pointless without a pending claim.[8] But as noted above, we are reversing the dismissal with instructions to grant the Trust's motion for leave to amend to add a

---

[8]   Federal litigants' discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). A litigant has no right to discovery on an unpleaded claim even when discovery is needed to make the claim viable. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009) ("Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.").

For the first time in its reply brief, the Trust argues that the requested discovery would bear on a defense to BYU's claim. But we do "not ordinarily review issues raised for the first time in a reply brief." *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1250 (10th Cir. 2020) (quoting *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000)).

20

crossclaim for breach of contract. Upon the filing of the amended crossclaim, the district court should reconsider the Trust's motion for leave to conduct discovery.

## III. The Trust's Motions to Seal

The Trust's opening brief, reply brief, and appendix contain information about Dr. Robertson's 1980 appointment letter from BYU. The Trust moved to seal parts of these documents, saying that BYU had designated these parts as highly confidential. BYU supported the motions, explaining that it had designated the information as confidential because it had appeared in Dr. Robertson's employment file. With this explanation, BYU cited an unpublished district court order, which protected the confidentiality of employment files. *Hamilton v. Ogden Weber Tech. Coll.*, No. 1:16-CV-00048-JNP-DBP, 2017 WL 5633106, at *5 (D. Utah Nov. 21, 2017).

We deny the Trust's motions to seal. To obtain an order to seal, the Trust must "overcome[] a presumption in favor of access to judicial records by 'articulat[ing] a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process.'" *Sacchi v. IHC Health Servs., Inc.*, 918 F.3d 1155, 1160 (10th Cir. 2019) (second alteration in original) (quoting *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1135–36 (10th Cir. 2011)).

21

The parties have not shown a "real and substantial" privacy interest in the existence or content of Dr. Robertson's appointment letter. The cited order served to protect discovery, not seal a court's docket, and the considerations differ. *See Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011) ("[T]he parties cannot overcome the presumption against sealing judicial records simply by pointing out that the records are subject to a protective order in the district court."). So the parties have not justified sealing, and we deny the Trust's motions.

## IV. Conclusion

We reverse the denial of the Trust's motion for leave to amend to add a crossclaim for breach of contract. Given the reversal, we remand for further proceedings. But we affirm the denial of the Trust's

- motion for leave to add a crossclaim for misappropriating trade secrets and

- motion for leave to conduct discovery.

We also deny the Trust's motions to seal.

Entered for the Court


Robert E. Bacharach
Circuit Judge

22